500 A.2d 329

**METALCRAFT, INC., et al.**

v.

**Benjamin H. PRATT.**

**No. 129, Sept. Term, 1985.**

Court of Special Appeals of Maryland.

Nov. 18, 1985.

Kevin M. McGeady (Edward L. Blanton, Jr. on brief), Towson, for appellants.

Jerry T. Lambdin (Charles E. Chlan & Associates on brief), Baltimore, for appellee.

Argued before MOYLAN, GARRITY and ADKINS, JJ.

ADKINS, Judge.

The principal question in this case involves the proper measure of damages for breach of warranty of title to personal property. There are subsidiary issues involving the manner in which the trial judge computed and applied those damages. Yet another issue deals with a judgment for attorney's fees purportedly entered pursuant to the provisions of a confessed judgment note. The damages issues were raised by way of defense to an action on the note. To put all the issues in context, we summarize the facts and the proceedings below.

In 1977 appellant and cross-appellee Metalcraft, Inc. purchased the marine hardware casting business of appellee and cross-appellant Benjamin H. Pratt. The purchase price was $100,000, part of which was paid in cash, with the balance of $70,500 to be paid in installments pursuant to Metalcraft's promissory note in that principal amount.[1] Both contract of sale and promissory note contained provisions for confession of judgment upon Metalcraft's default, and for payment of "a reasonable attorney's fee ..." in that event.

In the contract of sale, Pratt warranted that he was "the absolute owner of, and [had] good and merchantable title, free and clear of all encumbrances, to all the assets being sold hereby and [had] all the right, title and authority to sell and transfer the same...." Among the assets covered by that warranty were certain patterns used to produce marine hardware and other castings of various kinds.

As part of the transaction, Metalcraft also purchased a facility in Shrewsbury Township, Pennsylvania, known as the Hungerford Foundry. As to that, the contract warranted "that the business presently being operated by the Seller

---

1. Two additional appellants and cross-appellees, Joseph Ruiz and Joseph Sain, guaranteed the note. For simplicity's sake we shall refer to all appellants and cross-appellees as "Metalcraft".

[Pratt] is not in violation of any applicable zoning, building, health or other laws or ordinances...."

After settlement on the contract, Metalcraft began to operate Pratt's former business, but problems soon arose. At some point—perhaps in the Fall of 1977, perhaps in the Spring of 1978—Joseph H. Conboy and Associates claimed ownership of some of the patterns Metalcraft had bought from Pratt, and demanded their return. Metalcraft returned them and notified Pratt, who reimbursed Metalcraft for the value of the patterns and the cost of their return. Sometime thereafter—apparently in May 1978—the William H. Whiting Company similarly claimed some of the patterns. Metalcraft returned them to Whiting, although it is not clear precisely when this was done. And perhaps a year after that, Johnson Truck Body asserted ownership and demanded return of still more of the patterns. Metalcraft returned them to Johnson, apparently in May 1982.

In June 1978, meanwhile, the Shrewsbury Pennsylvania authorities brought charges of zoning violations with respect to the Hungerford Foundry. In April 1979 Metalcraft, through counsel, wrote Pratt about this situation. It received no response (Pratt, it seems, was seriously ill, having suffered two strokes) and resolved the zoning problem for $500 plus $377.85 in attorney's fees and expenses.

During all this time, and until March 1983, Metalcraft continued to pay monthly installments of principal and interest on the note, although not always promptly. But on March 24, 1983, counsel for Metalcraft wrote Pratt, enclosing a check for $384.94 which, it asserted, was the final payment due under the note. To reach this conclusion Metalcraft computed the value of the reclaimed patterns, added the zoning violation costs, and produced total credits of $23,711.85 that it credited against the original principal balance of the note. It then recomputed the interest due, took account of the monthly payments it had made, and produced a balance of $384.94 as the final payment.

Pratt saw the matter otherwise and on July 26, 1983, obtained a confessed judgment in the amount of $38,048.56 plus attorney's fees of 15 percent. On Metalcraft's timely motion that judgment was vacated in September 1983. In November 1984, without further pleading, the case went to trial. Because of the breaches of the warranties of title and zoning, the trial judge found Metalcraft entitled to a credit of $10,727 against the indebtedness of $38,048.56. He ordered the balance of $27,321.56 to be paid in a lump sum of $7,205.04 "and the remaining balance of $20,116.52 is to be paid in monthly installments of $855.37, [the installments called for by the note] effective December 1, 1984." He also entered judgment for attorney's fees of 15 percent, in the amount of $4,098.23. Metalcraft appealed. Pratt cross-appealed.

In its appeal, Metalcraft argues that the trial court

1. applied an incorrect measure of damages to its claim for breach of warranty of title to the patterns;
2. incorrectly computed the credits to which Metalcraft was entitled;
3. improperly applied the credits against the balance due on the note; and
4. erred in entering judgment for attorney's fees of 15 percent.

In his cross-appeal Pratt contends that

1. the trial judge erred in allowing any credit against the note; and
2. Metalcraft failed to plead its "counter-claim" properly.

We shall deal first with the cross-appeal.

## PRATT'S CROSS-APPEAL

### Allowance of Credits Against the Note

It appears to be Pratt's position that Metalcraft should be allowed no credits against the note because the note and the contract are separate documents. He says that "[t]he Note

is a legally binding negotiable contract, and [Metalcraft] should be ordered to give full faith and credit to it, paying the Note in full and meeting its obligations." In other words argues Pratt, defenses or claims that might be available to Metalcraft under the contract (*e.g.* breach of warranty of title) are not available to it with respect to the note.

Were Pratt a holder of the note in due course, this argument might have some merit, for a holder in due course takes the instrument free from certain defenses. Comm. Law Art. (U.C.C.) § 3–305. Even though the payee of a note may be, under some circumstances, a holder in due course, § 3–302(2), Pratt did not achieve that status as to the breach of warranty claims because as to those he did not take the instrument without notice of any defense against it. Section 3–302(1)(c). He had notice, for example, of the claims against at least the Whiting patterns long before the sale to Metalcraft. And in any event, even a holder in due course does not take the instrument free from defenses of a party to it with whom he has dealt. Section 3–305(2).

What we have here is an integrated agreement consisting of a contract of sale and a note. As the trial judge accurately observed, the contract expressly referred to and made provision for the note. The parties to this proceeding are the original parties to both contract and note. Under these circumstances, and to the extent established, a defense to or claim arising out of the contract is a defense against the note, whether we denominate it breach of warranty or partial failure of consideration. U.C.C. § 3–306, *cf. Weast v. Arnold*, 299 Md. 540, 474 A.2d 904 (1984). Thus, Pratt's initial contention on cross-appeal lacks merit.[2]

---

**2.** In his brief Pratt makes some arguments that seem to be based on Metalcraft's delay in complaining about the loss of the Whiting and Johnson patterns while at the same time continuing to make payments under the note. It is difficult to tell whether these comments go to an asserted waiver of the breach of contract or failure timely to revoke an acceptance under U.C.C. § 2–607, if that provision applies.

*Pleading*

As we have seen, the confessed judgment originally entered in Pratt's favor was vacated on Metalcraft's motion. The motion to vacate and the memorandum in support of it set forth in reasonable detail Metalcraft's assertion of breach of warranty of title to the patterns and breach of the zoning warranty, as well as the amount of credit claimed by Metalcraft. Nevertheless, although there was some discovery activity, no pleadings whatsoever were filed after the vacation of the confessed judgment. According to Pratt this is fatal to Metalcraft because after the vacation of a confessed judgment, appropriate pleadings should be filed to bring the matter to issue.

■ Pratt's notion that pleadings ordinarily should be filed after a confessed judgment has been vacated is correct. Former Md. Rule 645 d, in effect when the judgment in this case was vacated, provided that when a basis for vacating the confessed judgment had been sufficiently established, the court should "order the judgment vacated . . . with leave to the defendant to file a pleading. . . ." Present Rule 2–611(d) is to the same effect: "If the court finds that there is a substantial and sufficient basis for an actual controversy as to the merits of the action, the court shall order the judgment by confession . . . vacated and permit the defendant to file a responsive pleading." [3] *See Boyce v. Plitt*, 274 Md. 333, 335 A.2d 101 (1975). But his complaint comes too late. After the judgment was vacated, Pratt's lawyer wrote the clerk of court asking that the case "be placed on the active trial docket." Neither in that letter nor elsewhere in the record is there the slightest indication of

---

In any case, the record does not disclose that any such contentions were raised below and it is clear that the trial judge did not decide them. As a consequence, they may not be raised for the first time on appeal. Md. Rule 1085.

**3.** In point of fact, the judge who vacated the judgment said nothing about responsive pleadings. His order simply granted the motion to vacate and directed "that this matter stand for trial."

objection to lack of pleadings. The question was not raised and decided below; it is not before us. Md. Rule 1085. *See B. Howard Richards, Inc. v. Shearer,* 186 Md. 36, 38, 45 A.2d 627 (1946).

■ If it were before us, we would reject Pratt's contention. His argument that he was somehow surprised—despite the contentions made in Metalcraft's motion supporting its motion to vacate, despite discovery by both sides, and despite a day's trial with no objection raised on this point and no request for a postponement—is ludicrous. It is apparent from the transcript that both sides knew precisely what the issues in the case were, despite the lack of pleadings. Pratt had been informed of them in the memorandum supporting the motion to vacate, a document that contained all the information that any pleading would have furnished him. *See Stevens & Kendall Co. Inc. v. Headlee,* 56 Md.App. 310, 467 A.2d 794 (1983) (at hearing on motion to vacate confessed judgment, trial court reduced amount of judgment without further pleadings). Pratt's second contention on cross-appeal is as meritless as his first.

## METALCRAFT'S APPEAL

*Breach of Warranty of Title—Measure of Damages*

As we have seen, the trial judge found that Pratt had breached the warranty of title to the Whiting and Johnson patterns, a finding not disputed by Pratt on appeal. He determined a value for those patterns as of the date of sale. He then reduced that value by deducting depreciation for the period the patterns were in Metalcraft's possession. Thus, he based the credit on damages allowed Metalcraft for the breach of warranty of title on the value of the patterns approximately at date of dispossession. In due course we shall address the correctness of the valuation figure assessed by the judge; for the present we consider only the correctness of the measure of damages applied.

Metalcraft argues strenuously that the judge was wrong. It observes that the sale of the patterns was a sale of goods

falling within Title 2 of the U.C.C., as contained in the Commercial Law Article of the Maryland Code. It points to § 2–714 of that title, which in pertinent part provides:

(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been warranted, unless special circumstances show proximate damages of a different amount.

It is Metalcraft's position that in this case acceptance occurred when it took possession of the patterns following execution of the contract of sale in 1977. Section 2–606. The value of the Whiting and Johnson patterns at that date, it contends, was zero because Pratt did not own them. Pratt's non-ownership of the patterns is not questioned on appeal. Thus, says Metalcraft, its measure of damages for the breach should have been the value of the patterns if they had been as warranted, *i.e.,* their value at the time of sale, undiminished by subsequent depreciation. The choice, then, is between value at date of sale (Metalcraft) or value at date of dispossession (the trial judge). Although there appears to be no Maryland authority directly on point, we think the trial judge was correct.

There is no doubt that the language of § 2–714(2) can be read as Metalcraft reads it; indeed, it seems to say precisely what Metalcraft claims it does. At least one other court has construed it that way. In *Murdock v. Godwin,* 154 Ga.App. 824, 269 S.E.2d 905 (1980) Godwin, in April 1974, purchased a car from Murdock. There was a warranty of title. The car turned out to have been stolen. The police seized it in February 1977 and Godwin never saw it again. He sued Murdock and recovered the purchase price of the car (its value if it had been as warranted less zero—its value at acceptance). On appeal, Murdock claimed that the purchase price should have been reduced by the value of Godwin's almost three years' use of the vehicle. The Georgia Court of Appeals rejected this argument, quoting the Georgia version of § 2–714(2) (identical to the Maryland

statute) and observing "the trial court was correct in excluding irrelevant evidence as to the value of [Godwin's] use of the automobile subsequent to" the time of acceptance (purchase).  269 S.E.2d at 907.

Unfortunately, however, things with respect to the U.C.C. are not always what they seem to be on first reading. Scholars contend that § 2–714(2) does not regulate damages for breach of warranty of title, but that it in fact relates only to breach of warranty of quality.  R. Anderson, *Uniform Commercial Code* (3d ed. 1983) § 2–714:26; 2 A. Squillante and J. Fonseca, *Williston on Sales* (4th ed. 1974) § 16–8(2).  *But see* 3 W. Hawkland, *U.C.C. Series* (1984), § 2–714:03.  This is said to be so because § 2–714(2) is based on § 69(6) and (7) of the Uniform Sales Act; those provisions pertained to breaches of warranty of quality, not of title.  *Menzel v. List*, 24 N.Y.2d 91, 298 N.Y.S.2d 979, 982, 246 N.E.2d 742, 744 (1969).  Anderson, *supra*.[4]  Hawkland, however, notes that many courts treated these provisions as applicable to all breaches of warranty, on the theory that subsection (7) was merely illustrative of one method of applying the general rule established by subsection (6).  3 *U.C.C. Series* § 2–714:03.

It is suggested that because § 2–714(2) does not expressly apply to a breach of warranty of title, a court should look to pre-U.C.C. law in that situation, by virtue of the "special circumstances" provision of § 2–714(2) and because the U.C.C. comment to that section indicates it is not intended

---

**4.**  The U.S.A. provisions formerly appeared as Md.Code Art. 83, § 87(6) and (7) (1951).  They provided:

> (6) The measure of damages for breach of warranty is the loss directly and naturally resulting, in the ordinary course of events, from the breach of warranty.

> (7) In the case of breach of warranty of quality, such loss, in the absence of special circumstances showing proximate damages of a greater amount, is the difference between the value of the goods at the time of delivery to the buyer and the value they would have had if they had answered to the warranty.

These provisions were repealed by Ch. 538, Acts of 1963, which adopted the Maryland version of the U.C.C.

to provide for the exclusive measure of damages. Anderson, §§ 2–714:26 and 2–714:27; official comment (3) to § 2–714. Pre-U.C.C. case law is not too helpful, however. Under it, decisions relating to the measure of damages for breach of warranty of title range from purchase price plus interest to value of the goods at time of dispossession, to value without specifying any time of determination, to value at time of sale (which may or may not be the same as the purchase price). Anderson, § 2–714:27. *See also Menzel,* 298 N.Y.S.2d at 982, 246 N.E.2d at 744. We repeat that there are no Maryland reported decisions directly on point.

■ Other jurisdictions have faced this problem. They have applied § 2–714(2) to breaches of warranty of title. *Jeanneret v. Vichey,* 541 F.Supp. 80 (S.D.N.Y.1982), *reversed on other grounds,* 693 F.2d 259 (2d Cir.1982); *City Car Sales, Inc. v. McAlpin,* 380 So.2d 865 (Ala.Civ.App. 1979), *cert. denied,* 380 So.2d 869 (Ala.1980); *Murdock v. Godwin,* 154 Ga.App. 824, 269 S.E.2d 905 (1980); *DeWeber v. Bob Rice Ford, Inc.,* 99 Idaho 847, 590 P.2d 103 (1979); *Ricklefs v. Clemens,* 216 Kan. 128, 531 P.2d 94 (1975); *Itoh v. Kimi Sales, Ltd.,* 74 Misc.2d 402, 345 N.Y.S.2d 416 (Civ.Ct. City of N.Y., 1973); *Schneidt v. Absey Motors, Inc.,* 248 N.W.2d 792 (N.D.1976). We shall do likewise. The statute is plain and unambiguous on its face and should be read according to its clear meaning. *Montgomery County v. Fulks,* 65 Md.App. 227, 232, 500 A.2d 302, 305 (1985). It manifests a legislative intent to apply the specified measure of damages to all breaches of warranty under the U.C.C.

■ The next question is whether to apply § 2–714(2)'s "difference at the time and place of acceptance between the value of the goods accepted and the value they would have had as warranted" or whether there are "special circumstances [that] show proximate damages of a different amount." We hold that there are special circumstances here which take the case out of the ordinary § 2–714(2) rule.

This, too, is an issue that other jurisdictions have addressed. With the sole exception of Georgia (*Murdock v. Godwin, supra*) all have found special circumstances to exist in breach of warranty of title cases. The special circumstances have arisen because, *e.g.*, the buyer of a stolen car had use and possession of it for some period of time without notice of any defect, *City Car Sales*, 380 So.2d at 868; because the goods in question had been stolen, *Itoh*, 345 N.Y.S.2d at 420; and because a unique chattel was involved, *Jeanneret*, 541 F.Supp. at 85. Two of those factors are present here. Metalcraft had use and possession of the patterns for varying periods of time before it had knowledge of any title defects. And the patterns were unique; they were specially designed to produce castings to particular specifications.

Since we conclude that this case falls within the "special circumstances" clause of § 2–714(2), we must now decide what measure of damages to apply under it. Courts that have considered the question under the U.C.C. have almost uniformly rejected the view that the purchase price of the goods is the proper measure. *See* Annotation, "Measure of Damages in Action for Breach of Warranty of Title to Personal Property Under UCC § 2–714," 94 A.L.R.3d 583 (1979). The more recent cases we have cited above bear out this analysis. The value of the goods at the approximate date of dispossession, or something akin to that, is the measure of damages generally selected. *See, e.g., City Car Sales*, 380 So.2d at 868, *DeWeber*, 590 P.2d at 105, *Ricklefs*, and *Schneidt*.

■ *Schneidt*, it is true, involved a situation in which the goods had appreciated in value between the time of purchase and the time of dispossession. That was also true in *Jeanneret*. But in *Itoh* the court applied the value at date of dispossession although the goods had depreciated in value. This is consistent with the general principle of contract law that the party aggrieved by a breach of contract should receive damages that place him in as good a

position as he would have enjoyed had the contract not been breached; in other words, that party is entitled to the benefit of his bargain. *National Micrographics Systems, Inc. v. OCE–Industries, Inc.,* 55 Md.App. 526, 465 A.2d 862 (1983).

Metalcraft urges that we reject this principle and instead, despite the special circumstances that take the case out of the basic rule of § 7–214(2), apply the value of the patterns at date of sale. It relies on *Park Circle Motor Co. v. Willis,* 201 Md. 104, 92 A.2d 757 (1952), a case decided under the Uniform Sales Act. *Park Circle* does hold that the measure of damages is the value of the property at the date of sale, plus interest. No depreciation was allowed. 201 Md. at 108–109, 92 A.2d 757. But *Park Circle* involved an action for recission under former Art. 83, § 87 (1)(d) which provided that upon recission, the purchaser could recover any part of the purchase price paid. *See also* former Art. 83, § 87(4). The court expressly noted that it was not deciding the measure of damages for breach of warranty of title. 201 Md. 111 (on motion for clarification). *Compare Menzel,* 298 N.Y.S.2d at 982–983, 246 N.E.2d at 744–745, in which the Court of Appeals of New York, applying the Uniform Sales Act, rejected the value at date of sale and applied the value at date of dispossession, relying on the general contract principle we have noted.

■ Ordinarily, the injured party should not be placed in a position better than the one he would have occupied had the contract not been breached. As the *Itoh* court explained, this achieves the purpose of contract damages—to make the injured party whole. 345 N.Y.S.2d at 418. Thus, in a breach of warranty of title case,

the measure of damages should be the value of such property when it is taken away. In this way the buyer will recover what he has 'actually lost.' He will get the benefit of any appreciation ... including items of value he may have added to the stolen property ...; and, on the other hand, he will not be unduly enriched by depreci-

ation in the value of the property, from the use of which he benefitted until it was taken from him. . . .

*Id.* at 420. This two-way street approach to the measure of damages is consistent with the language of § 2–714(2). Under the provisions of the Uniform Sales Act, the measure of damages was, arguably, the greater of the value at date of sale and the value at date of dispossession. The "special circumstances" there spoke of the difference between the value of the goods if as warranted and the value at the time of delivery "in the absence of special circumstances showing proximate damages in *a greater amount.* . . ." [emphasis added]. *See* note 4, *supra.* But § 2–714(2) speaks of "special circumstances [that] show proximate damages of *a different* amount." "Different" may be either greater or less, and we hold that the proper measure of damages is indeed the value of the goods at date of dispossession whether that value be larger or smaller than the value of the goods at acceptance.

In Metalcraft's case, the value at date of dispossession was, because of depreciation, less than the value at date of acceptance. Nevertheless, using this value gives Metalcraft the benefit of its bargain. For various periods of time (we cannot determine the precise periods because of the unsatisfactory record), it had the benefit of the use of the Whiting and Johnson patterns. During these same periods the patterns depreciated. To allow Metalcraft the measure of damages it proposes would give it more than it bargained for—the use of the patterns without any off-set for depreciation. The trial judge applied the proper measure of damages.

## Computation of the Credit

Although we have held that the trial judge did not err in determining that Metalcraft's measure of damages was the value of the patterns at the approximate date of dispossession, we must now address Metalcraft's argument that the amount of damages (credit) was incorrectly computed. In

addition, Metalcraft takes issue with the amount of credit allowed in connection with the zoning problem.

As to the credit for the patterns, Metalcraft begins with the proposition that the total value of all the patterns at the date of acceptance (sale) was $25,000. It points to evidence that the Whiting patterns may have constituted 75 percent of all the patterns. Thus, says Metalcraft, they should have been assigned a base value of $18,750 (75 percent of $25,-000) to which should be added $3,840 (the appraised value of the Johnson patterns) for a total of $22,590 of the unowned Whiting and Johnson patterns. This figure stands in contrast to the $15,000 amount used by the trial judge.

According to Metalcraft, the trial judge went astray by undervaluing the Whiting patterns and by omitting from his calculations the value of the Johnson patterns. Metalcraft misunderstands, at least in part, the judge's valuation approach. The record makes clear that the judge did not attempt to value each group of patterns separately. Instead, he set a sale-price value of $20,000 for *all* the patterns purportedly sold and applied to that sum a figure of 75 percent on the basis of testimony—somewhat vague, but nevertheless, testimony—that the patterns remaining after return of the unowned ones were worth 25 percent of all the patterns. That was the basis for his $15,000 value for the Whiting and Johnson patterns, and there was sufficient evidentiary basis for the 75 percent—25 percent allocation to withstand the clearly erroneous test of Md. Rule 1086. The problem is not with the judge's methodology, but with the fact that he used the wrong point of beginning.

■ With respect to the patterns, the contract of sale set forth: "Approximate cost to replace patterns ... $20,000 to $25,000." It established the total sales price for the foundry inventory at $60,000 (including a figure for goodwill). In order to obtain the $60,000 total (part of the overall price that formed the basis for Metalcraft's note) the figure of $25,000 had to be included for the patterns. Were the $20,000 figure used, the total purchase price would be $5,000 less than the price Metalcraft agreed to pay. It is

true that purchase price is not necessarily equivalent to value of goods at date of purchase. *Puritan Manufacturing, Inc. v. Klayman & Co.,* 379 F.Supp. 1306, 1314 (E.D. Pa.1974). But the question now becomes whether the judge had before him any other evidence suggesting value different than $25,000 for the patterns. The answer is in the negative. While there were testimony and exhibits setting various amounts for the Whiting patterns (from $14,000 to $19,000), the only evidence as to the total value of all the patterns was the contract of sale, and the price there set forth is some evidence of value. *Id.* We repeat that Metalcraft's note was based on that total price. In short, on this record, and as a matter of construction of the contract, the judge should have started with an overall value of $25,000 for all the patterns and applied to that figure the 75 percent attributable to the Whiting and Johnson patterns and the percentage attributable to depreciation. This would have produced a credit of $18,750 less one-third depreciation ($6,250) or $12,500 for the patterns, instead of the $10,000 allowed. Thus, Metalcraft is entitled to an additional credit of $2,500 for the patterns.

As to the zoning matter, the trial judge accepted as the correct amounts of damages the figures of $727 plus $150.[5] Unaccountably, when he gave judgment, he simply omitted to include the latter amount. We hold that Metalcraft is entitled to additional credit of $150 relative to the zoning violation.

### Allocation of Credits

So far, we have held that Metalcraft is entitled to· credits against the note of $2,650 more than the trial judge allowed.

---

**5.** No question has been raised as to the proper measure of damages for breach of the zoning warranty. It involved real estate, not the sale of goods, and thus may not fall within § 2–714 at all. *See Anthony Pools v. Sheehan,* 295 Md. 285, 295, 455 A.2d 434 (1983) ("hybrid" transaction—U.C.C. applies to diving board, although services were involved, not sale of goods). But since the issue of the proper measure of damages was not raised and decided below, Md. Rule 1085, we accept, as did the trial judge, the amounts proved.

The next question is how to allocate those credits. We hold that the method used by the trial judge, with respect to the credits he did allow, was incorrect.

The judge, as we have noted, gave Metalcraft total credit in the amount of $10,727. In formulating his judgment, he reviewed the schedule of payments under the note and found the last payment was made on March 1, 1983, leaving a balance of $36,876.96. He then added an additional year's payments of $855.37 per month or $10,264.44, deducted that from the credits of $10,727, leaving a sum of $362.56 [6] as of March 1, 1984. To that he added monthly payments from April through November 1984 (the month of trial) to produce a figure of $7,205.45 [7] "to bring [the note] to date." He then ordered Metalcraft to make that lump sum payment and to resume monthly payments of $855.37 on December 1, 1984.

The problem with this approach is that it really did not give Metalcraft the full benefit of the credits of $13,377 to which we have held it is entitled. The $855.37 figure was a monthly payment that included both principal and interest. The installment sale contract provided that should "any claim be asserted against the personal property being sold hereunder in satisfaction of any liability of any kind ... of [Pratt], then and in that event [Metalcraft] may pay such claim in discharge of such liability, which payment shall be credited to payments due hereunder, first in satisfaction of interest due as of the date of such payment, and then to a reduction of any principal due hereunder...."

The claims asserted against the Whiting and Johnson patterns fall within this provision. While it is true that Metalcraft did not "pay" these claims, it did essentially the same thing; it returned the patterns to their true owners. In the absence of argument to the contrary, we shall treat

---

6. There was an error in the trial judge's calculations. The $362.56 figure should be $462.56.

7. Another error occurred. The $7,205.45 figure should be $7,205.52.

the zoning credit similarly. Thus, the full amount of the credit should have been applied in satisfaction of interest due at date of payment (approximately three years after the sale) and then in reduction of principal. We do not know how much interest, if any, was due approximately three years after date of sale. The record shows that Metalcraft was not always timely in its payments, so interest may have been due at that date. Because we do not have that information, we cannot determine what amount principal should have been reduced. We must vacate the judgment and remand so that the proper amount of credits may be allowed and then properly allocated against the indebtedness.

### Counsel Fees

When Pratt obtained his confessed judgment in July 1983, it included attorney's fees of 15 percent of the $38,048.50 amount of the judgment. The entry of a 15 percent attorney's fee was error because the note provided for "a reasonable attorney's fee" and not a fee of 15 percent. In *Meyer v. Gyro, Transport Systems, Inc.*, 263 Md. 518, 531, 283 A.2d 608 (1971), the Court of Appeals held that when a note provides for a reasonable fee, as opposed to a percentage fee, "the reasonable amount of the fee must be determined *by the court* and counsel may not, himself, use a percentage to determine the amount of the attorney's fee" [emphasis in original]. Of course, that particular error is of no import now, since the entire confessed judgment was vacated. But the question arises again because when the trial judge entered judgment for Pratt, he signed an order (conceded at oral argument to have been prepared by counsel for Pratt without consultation with counsel for Metalcraft) again providing for "attorneys [*sic*] fees of 15% of $38,048.56 less the sum of $10,727.00, which totals $4,098.23 . . . ." Again, under the *Meyer* holding, this was error.

The so-called "American Rule" provides "generally that the prevailing party may not recover its attorney's fees

from the losing party." *Skeens v. Paterno,* 60 Md.App. 48, 67, 480 A.2d 820, *cert. denied,* 301 Md. 639, 484 A.2d 274 (1984). There are, of course, a number of well-recognized exceptions to this rule. One of them applies when the parties by contract (for example, a confessed judgment note) agree that fees shall be paid by the loser. *Qualified Builders, Inc. v. Equitable Trust Co.,* 273 Md. 579, 331 A.2d 293 (1975); *Fithian v. Jamar,* 286 Md. 161, 165, 410 A.2d 569 (1979). But, as we have observed, the note here did not provide for payment of 15 percent fees, but for a reasonable fee. As a consequence, the fee award must at least be vacated. Since the case must in any event be remanded, the question now becomes whether, on remand, the trial judge should give further consideration to the fee issue. We think he should.

Metalcraft argues that it agreed only to pay reasonable attorney's fees in connection with the obtaining of a confessed judgment. When that judgment was totally vacated, it says, there was no longer any confessed judgment case, but only an ordinary action to collect a contract debt. It quotes *Qualified Builders,* 273 Md. at 584, 331 A.2d 293: "That no attorney's fees may be collected by a plaintiff under an agreement contained in a cognovit note, unless there exists a valid confession of judgment, is made plain by the prior decisions of this Court." Its reliance on *Qualified Builders* is misplaced, however. In that case the Court of Appeals held only that when the confessed judgment was invalid because the trial court had not obtained jurisdiction over the defendants no attorney's fees became due under the terms of the instrument there involved. The Court also pointed out that no valid judgment for the plaintiff had even been entered before full payment of the debt. 273 Md. at 586, 331 A.2d 293. The "prior decisions" cited in *Qualified Builders* are likewise not on point.

Metalcraft is correct in stating that once the confessed judgment was vacated the action became one to collect a contract debt. But that very contract included a

provision for attorney's fees: "if this note or any installment is not paid when due" it authorized an attorney to appear for Metalcraft "and confess judgment against it for all amounts due hereunder . . . with costs of suit . . . and with a reasonable attorney's fee. . . ." This was an agreement to pay attorney's fees incurred in connection with the collection of any sum due on the note; *see* 3 *Freeman on Judgments* 2731 (5th ed. 1925). The confession of judgment was merely a means to that end.

If, of course, the judgment below had been in Metalcraft's favor on the merits, no fees would have been allowable. The predicate for that action—some amount due on the note—would have been destroyed. But here that was not the result. Something was due on account of the note. Thus, there was a proper basis for Pratt's collection efforts, and even though the amount eventually recovered will be substantially less than that originally claimed, the contractual basis for fees remains. When the plaintiff ultimately prevails, at least to some degree, fees, "where allowable," may be included as part of the judgment. 3 *Freeman* 2764. *And see* Annotation, "Recovery of attorneys' fees provided for in bill, note, or similar evidence of indebtedness," 41 A.L.R.2d 677, 681 (1955).

Thus, on remand, the trial court must determine what is a reasonable fee for Pratt's attorneys in this case. In doing so it will, of course, consider the ultimate amount of Pratt's judgment, the substantiality of Metalcraft's basis for defending (in part successfully) against that judgment and relevant factors "to be considered as guides in determining the reasonableness of a fee" as set forth in DR 2–106(B), Code of Professional Responsibility; Md. Rule 1230.

JUDGMENT VACATED AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED EQUALLY BETWEEN APPELLANTS AND APPELLEE.