Nebraska Supreme Court Online Library
www.nebraska.gov/courts/epub/
03/04/2016 09:16 AM CST

JAMES McCOOLIDGE, APPELLANT,
v. DANIEL OYVETSKY ET AL.,
APPELLEES.

___ N.W.2d ___

Filed March 4, 2016.    No. S-14-1135.

1. **Trial: Judgments: Appeal and Error.** In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict, which an appellate court will not disturb unless clearly wrong.
2. **Judgments: Appeal and Error.** An appellate court independently reviews questions of law.
3. **Uniform Commercial Code: Breach of Warranty.** The seller breaches the warranty of title in Neb. U.C.C. § 2-312 (Reissue 2001) if there is a substantial cloud or shadow over the title, even if no third party has come forward with a superior claim.
4. ____: ____. A seller breaches the warranty of title in Neb. U.C.C. § 2-312 (Reissue 2001) by delivering a defective certificate of title to the buyer.
5. **Uniform Commercial Code: Breach of Warranty: Damages: Proof.** Buyers asserting a breach of warranty under the Uniform Commercial Code must not only prove the warranty and breach thereof, but also the cause of their loss and the extent of their damages.
6. ____: ____: ____: ____. Buyers asserting a breach of warranty under the Uniform Commercial Code do not have to prove damages with mathematical certainty, but the evidence must be sufficient to allow the trier of fact to estimate the actual damages with reasonable certainty.
7. **Uniform Commercial Code: Damages.** If the buyer accepts defective goods, damages are measured under Neb. U.C.C. § 2-714 (Reissue 2001).
8. **Uniform Commercial Code: Damages: Proof.** The existence of "special circumstances" under Neb. U.C.C. § 2-714 (Reissue 2001) is not a

precondition to a buyer's recovery of incidental and consequential damages under Neb. U.C.C. § 2-715 (Reissue 2001).

9. **Motor Vehicles: Damages.** The reasonable value of the loss of use of a motor vehicle is generally the fair rental value of a like vehicle for a reasonable length of time or the amount actually paid, whichever is less.

10. **Motor Vehicles: Breach of Warranty: Damages: Time.** The period for which the buyer of a motor vehicle can recover loss of use damages should generally correspond to the length of time that the buyer would have used the vehicle but for the breach of warranty.

Appeal from the District Court for Douglas County: SHELLY R. STRATMAN, Judge. Affirmed.

Thomas M. White, C. Thomas White, and Amy S. Jorgensen, of White & Jorgensen, for appellant.

Terry J. Grennan, of Cassem, Tierney, Adams, Gotch & Douglas, for appellee Travelers Casualty and Surety Company of America.

HEAVICAN, C.J., WRIGHT, CONNOLLY, MILLER-LERMAN, CASSEL, and STACY, JJ.

CONNOLLY, J.

## SUMMARY

James McCoolidge bought a used automobile over the Internet and had trouble registering the certificate of title in Nebraska. He sued the man with whom he directly dealt, a dealership in Tennessee, and an insurer that had issued a surety bond to the dealership. The trial court concluded that although the sellers initially breached the warranty of title, McCoolidge had not proved the damages he suffered from the delay in obtaining good title. McCoolidge appeals, arguing that even if he could register a certificate of title, other problems remained. We conclude that McCoolidge did not prove his damages and therefore affirm the court's judgment for the defendants.

## BACKGROUND

### McCOOLIDGE'S EMPLOYMENT

Before multiple sclerosis forced him to retire, McCoolidge worked as an automobile mechanic and salesperson. He was a "part owner" of Cars on Keystone, a used car dealership, and held a sales license in that capacity.

Thomas Monteith, an accountant, testified that he was the "owner" of Cars on Keystone, which was the trade name of Classic Auto Rental Service, LLC. Monteith explained that McCoolidge had a "profit interest" in the dealership, meaning that "if it makes money, he gets a percentage, if it loses, I get the loss since I am funding the company." The articles of organization for Classic Auto Rental Service identify two members: McCoolidge and Monteith Brothers, Inc.

Monteith did not take an active role in Cars on Keystone. He said that McCoolidge took "care of anything" and that the "only thing I see is the bank statement." No one else was involved in the business. Cars on Keystone was defunct by the time of trial.

### PURCHASE OF THE AUTOMOBILE

Because of the progressive nature of multiple sclerosis, McCoolidge wanted a vehicle that could accommodate a person in a wheelchair. He found a vehicle "sitting at a salvage yard" with a "motorized ramp and other accessories necessary to convert a Honda Element into a handicapped-accessible vehicle." He had the opportunity to remove the equipment at no cost. Having found the equipment, McCoolidge searched for a suitable vehicle in which to install it.

In March 2011, McCoolidge saw a 2008 Honda Element with structural damage (Element) advertised in an online auction. He contacted the seller, who identified himself as Daniel Oyvetsky. According to McCoolidge, Oyvetsky said that he was selling the Element for Car and Truck Center L.L.C., a licensed dealer in Nashville, Tennessee. McCoolidge verified

Oyvetsky's representation by calling Car and Truck Center and speaking with Alexander Davidoff.

When the auction closed without a buyer, Oyvetsky reached out to McCoolidge. McCoolidge agreed to buy the Element for $7,500 and transferred the purchase price to a PayPal account associated with Oyvetsky or Car and Truck Center.

McCoolidge instructed Oyvetsky and Car and Truck Center to assign the title to Cars on Keystone. McCoolidge explained that he wanted the title assigned to the dealership because it would give him more time to register the certificate of title in Nebraska and because he wanted to use the dealership's facilities to repair the Element. He expected that Cars on Keystone would transfer title to him once the repairs were finished.

About a week after the purchase, McCoolidge received the Element followed by a certificate of title. McCoolidge, however, had trouble registering the certificate. He spoke to Oyvetsky, who was unable or unwilling to solve the problem. McCoolidge said he also spoke with Davidoff, who "didn't want anything to do with it."

In July 2011, McCoolidge filed a complaint against Car and Truck Center with the Tennessee Motor Vehicle Commission. He told the commission that Car and Truck Center had not provided him with a valid certificate of title. McCoolidge acknowledged that he received a certificate of title which "my DMV said . . . might be ok," but he was "not comfortable with might."

In an affidavit, Davidoff stated that he bought the Element from "W. McInnis" in September 2010 and asked Oyvetsky to advertise the vehicle. Davidoff said he shipped the Element to McCoolidge, but a problem arose because it "was title[d] to [a] Lease Company and not McInnis." Davidoff stated that McCoolidge had "pulled back 4000.⁰⁰ of the 7500.⁰⁰ paid" and that Davidoff would not send the correct certificate of title to McCoolidge until he returned the money.

At trial, Davidoff denied buying or selling the Element. Rather, he "sen[t] title to Car of Keystone in the favor and the

request for . . . Oyvetsky." Davidoff said he told the Tennessee
Motor Vehicle Commission that "the previous owner of this
Element came from a leasing company and did not transfer
the vehicle to his name." He said that the "previous owner"
was "Veritas Video." Davidoff said that the "owner" when
McCoolidge bought the Element was Igor Tavakalov.

Tavakalov testified that he "bought [the Element], but never
registered it on my name." He said the "previous owner" was
"McGinnis and Veritas," with "McGinnis" being a natural per-
son who owned a "production company" called Veritas.

CERTIFICATES OF TITLE

There are numerous certificates of the title issued by the
State of Tennessee in the record, some of which appear to be
copies of the same certificate. The dates on which McCoolidge
received the various certificates are less than clear.

One of the certificates states that title is vested in "HONDA
LEASE TRUST." On the reverse, Honda Lease Trust assigned
title to "VERITAS F AND VIDEO, WILLIAM W MCINNES,"
who reassigned title to Car and Truck Center, which reassigned
title to Cars on Keystone.

Other certificates state that title is vested in "VERITAS F
AND VIDEO" and "WILLIAM W MCINNIS," with various
permutations of assignments and reassignments on the reverse.
For example, on the reverse of one certificate, "Veritas Film
& Video" assigned title to Car and Truck Center, which reas-
signed title to Cars on Keystone. On the reverse of another,
"William W. McInnes" assigned title to Cars on Keystone. On
the reverse of yet another certificate, "Veritas F & Video" and
"William W. McInnes" assigned title to Cars on Keystone.

McCoolidge testified that he never received "clear" or
"usable" title. He believed he needed a certificate that "showed
transfer from the lessor and Honda into Car and Truck, Inc.
and then to Cars on Keystone." Later, he testified that the
title should be "declared up from Veritas Video to Cars and
Truck and then to Cars on Keystone." Later yet, McCoolidge

testified that the problem, as he saw it, was that title was "still assigned" to Veritas Video, an entity with which McCoolidge had no relationship. But he had "no idea" whether Veritas Video was "one of the reasons for kind of the missing link in the chain of title." McCoolidge said he never received a bill of sale, although, when asked about "Cars on Keystone on a bill of sale or an actual purchase agreement," he said "[t]here was one tendered but then thrown away because there was no title . . . ."

In his deposition, McCoolidge testified that he had received a certificate of title that he could have registered in Nebraska. Shown one of the certificates and asked if it was "good title," McCoolidge answered: "It's — according to Douglas County, with a valid vehicle inspection, which the [vehicle identification number] matches the title, it would transfer into the State of Nebraska as a valid Nebraska title." He had shown the certificate to the Nebraska Department of Motor Vehicles, and "[t]hey said it looks to be transferrable in its form." But McCoolidge said he would not register the title "until this is settled," because he had "no idea which way this is going to go." His attorney explained that he could "get a title issued," but that he preferred to "present it to the court and have the court tell us what should be done."

McCoolidge reviewed his deposition testimony during his cross-examination at trial. He said: "I've seen several titles in reference to this, and I don't remember which title. But if I was presented with a title that was transferable, it's possible. If it was transferable, I told you the truth. It would be transferable." But on redirect, McCoolidge said the Department of Motor Vehicles rejected the certificate of title that the attorney representing the insurer "was talking to [McCoolidge] about earlier that he said, as far as you know, you thought it was good."

### Damages

McCoolidge testified that he repaired the structural damage to the Element "almost immediately" because he "had

everything lined up." He estimated he spent nearly $8,000 on repairs.

McCoolidge never drove the Element. He bought two other automobiles that he used for transportation after he bought the Element, paying a total of $5,000 or $6,000. He did not rent a vehicle.

McCoolidge did not remove the motorized ramp from the salvaged vehicle. He explained that he could have removed the equipment but "let it go" because he did not feel that he owned the Element. He thought the forgone equipment was worth "[t]housands."

McCoolidge stored the Element at Cars on Keystone until July 2012, when he moved it to the garage at his residence. McCoolidge never paid to store the Element but testified that Monteith sent him a bill for storage fees. He produced a May 2011 bill from "Classic Auto Rental & Repair Services"— which he said was Cars on Keystone's "parent company"— stating that the "Unit Price" for "Store inside facility" was $30 per day. He said that "Douglas County" charges $45 per day to store towed vehicles.

Monteith was unaware of any storage fees at Cars on Keystone and had never seen a bill for the Element. He testified that he did not know if McCoolidge kept the Element at Cars on Keystone, because "I haven't been in the building for two years." Asked about McCoolidge's reference to a "parent company" that "wants to charge a lot of storage," Monteith said "[t]here is no parent company that I know of." If someone charged for storage at Cars on Keystone, Monteith said it would have been McCoolidge.

## Procedural Background

In 2011, McCoolidge sued Oyvetsky, Car and Truck Center, and Travelers Casualty and Surety Company of America. The insurance company had issued a surety bond to Car and Truck Center for the "protection of any person who suffers loss because of . . . [t]he dealer's failure to deliver in conjunction

with the sale of a vehicle a valid vehicle title certificate free and clear of any prior owner's interests . . . ."

McCoolidge accused the defendants of failing to deliver "clear title" for the Element. He claimed the following damages: (1) storage costs; (2) loss of use; (3) repair costs "wasted in light of the defective title"; and (4) "[c]ost of cover in the attempt to obtain a clear title."

In 2014, the court entered a judgment for the defendants. It found that McCoolidge initially contracted with Oyvetsky, but that Car and Truck Center "inserted itself into the transaction to become a party to the contract," thus triggering the protection of the surety bond. In the court's findings of fact section, it stated that McCoolidge "admitted that he was presented with a title that he could use to register the [Element], but was waiting for the resolution of this lawsuit to do so."

The court concluded that the defendants initially breached the warranty of title in Neb. U.C.C. § 2-312 (Reissue 2001), but that McCoolidge eventually "received good title in 2011, sometime after May and before [his] deposition." McCoolidge could recover damages caused by the delay but had failed to prove them. For example, the court explained that McCoolidge was "entitled to the difference in value of the [Element] with good title compared to what he received, but there is no evidence of that amount in the record." As to McCoolidge's request for storage costs, loss of use, repair costs, and cover costs, the court found that any such expenses were not "'directly attributable'" to the defendants' breach.

McCoolidge appeals.

ASSIGNMENTS OF ERROR

McCoolidge assigns, consolidated, that the court erred by (1) determining that he received "good title" despite the absence of a bill of sale or "other supporting documentation" and the presence on the certificate of title of a "third party who was a complete stranger to the transaction" and (2) determining that he failed to prove damages.

## STANDARD OF REVIEW

[1,2] In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict, which an appellate court will not disturb unless clearly wrong.[1] We independently review questions of law.[2]

## ANALYSIS

The district court determined that the sellers stood in breach of the warranty of title until they delivered a certificate of title to McCoolidge "sometime in 2011" that he could register in Nebraska. McCoolidge argues that, despite receiving a registrable certificate of title, he still did not have good title because he lacked a "bill of sale or other customary documentation" and the certificate "name[d] a third party to the transaction."[3]

Two legislative enactments are particularly relevant to the sale of automobiles. The first is article 2 of the Uniform Commercial Code, which governs the sale of "goods," including automobiles.[4] The second is the Motor Vehicle Certificate of Title Act.[5] We consider article 2 "concurrently with the certificate of title act."[6]

---

[1] *Timberlake v. Douglas County*, 291 Neb. 387, 865 N.W.2d 788 (2015). See, also, *Koperski v. Husker Dodge, Inc.*, 208 Neb. 29, 302 N.W.2d 655 (1981); *Larutan Corp. v. Magnolia Homes Manuf. Co.*, 190 Neb. 425, 209 N.W.2d 177 (1973).

[2] See *Timberlake v. Douglas County, supra* note 1.

[3] Brief for appellant at 8, 9.

[4] See, Neb. U.C.C. § 2-102 (Reissue 2001); *Worley v. Schaefer*, 228 Neb. 484, 423 N.W.2d 748 (1988); *Dugdale of Nebraska v. First State Bank*, 227 Neb. 729, 420 N.W.2d 273 (1988), *overruled in part on other grounds, Aken v. Nebraska Methodist Hosp.*, 245 Neb. 161, 511 N.W.2d 762 (1994). See, also, Annot., 47 A.L.R.5th 677 (1997).

[5] See Neb. Rev. Stat. §§ 60-101 to 60-197 (Reissue 2010, Cum. Supp. 2014 & Supp. 2015).

[6] See *Dugdale of Nebraska v. First State Bank, supra* note 4, 227 Neb. at 734, 420 N.W.2d at 277.

The district court determined that the sellers initially breached the warranty of title in § 2-312(1). That section provides:

[T]here is in a contract for sale a warranty by the seller that

(a) the title conveyed shall be good, and its transfer rightful; and

(b) the goods shall be delivered free from any security interest or other lien or encumbrance of which the buyer at the time of contracting has no knowledge.

[3] The seller breaches the warranty of title in § 2-312 if there is a substantial cloud or shadow over the title, even if no third party has come forward with a superior claim.[7] Section 2-312(1)(a) guarantees the buyer "a good, clean, title transferred to him or her also in a rightful manner so that he or she will not be exposed to a lawsuit in order to protect it."[8]

McCoolidge directs us to § 60-140 of the Motor Vehicle Certificate of Title Act, which we have referred to as an "invalidating provision."[9] Section 60-140(1) provides:

[N]o person acquiring a vehicle from the owner thereof, whether such owner is a manufacturer, importer, dealer, or entity or person, shall acquire any right, title, claim, or interest in or to such vehicle until the acquiring person

---

[7] See, *Saber v. Dan Angelone Chevrolet, Inc.*, 811 A.2d 644 (R.I. 2002); *Colton v. Decker*, 540 N.W.2d 172 (S.D. 1995); *Maroone v. Chevrolet, Inc. v. Nordstrom*, 587 So. 2d 514 (Fla. App. 1991); *U-J Chevrolet Co., Inc. v. Marcus*, 460 So. 2d 1341 (Ala. Civ. App. 1984); *City Car Sales, Inc. v. McAlpin*, 380 So. 2d 865 (Ala. Civ. App. 1979); *Ricklefs v. Clemens*, 216 Kan. 128, 531 P.2d 94 (1975); 77A C.J.S. *Sales* § 458 (2008). But see, *C.F. Sales, Inc. v. Amfert, Inc.*, 344 N.W.2d 543 (Iowa 1983); *Skates v. Lippert*, 595 S.W.2d 22 (Mo. App. 1979).

[8] § 2-312, comment 1. See, also, *Stauffer v. Benson*, 288 Neb. 683, 850 N.W.2d 759 (2014); *Omermiller v. Baasch*, 284 Neb. 542, 823 N.W.2d 162 (2012).

[9] *Worley v. Schaefer, supra* note 4, 228 Neb. at 489, 423 N.W.2d at 751 (citing former Neb. Rev. Stat. § 60-105 (Reissue 1984)).

has had delivered to him or her physical possession of such vehicle and (a) a certificate of title or a duly executed manufacturer's or importer's certificate with such assignments as are necessary to show title in the purchaser, (b) a written instrument as required by section 60-1417, (c) an affidavit and notarized bill of sale as provided in section 60-142.01, or (d) a bill of sale for a parts vehicle as required by section 60-142.

Other relevant sections of the Motor Vehicle Certificate of Title Act include § 60-139, which prohibits a purchaser from possessing a "certificate of title which does not contain such assignments as are necessary to show title in the purchaser or transferee." One who operates a motor vehicle for which a certificate of title is required without having such a certificate is guilty of a misdemeanor under § 60-180.

We note that the Motor Vehicle Certificate of Title Act is the exclusive method of transferring title to a vehicle, but it is not conclusive of ownership.[10] Between the buyer and seller of a motor vehicle, the certificate of title is only prima facie evidence of ownership.[11] If the seller wrongly refuses to deliver a valid certificate, Neb. U.C.C. § 2-401 (Cum. Supp. 2014) dictates when title passes.[12]

[4] Here, the court determined that the sellers initially breached the warranty of title by failing to deliver a certificate that McCoolidge could register. Neither Oyvetsky nor Car and Truck Center challenge this conclusion. A seller breaches the warranty of title in § 2-312 by delivering a defective certificate of title to the buyer.[13] We agree with the court that the sellers breached the warranty of title by failing to provide

---

[10] *Hanson v. General Motors Corp.*, 241 Neb. 81, 486 N.W.2d 223 (1992).

[11] *Id.*; *Alford v. Neal*, 229 Neb. 67, 425 N.W.2d 325 (1988).

[12] *Alford v. Neal, supra* note 11.

[13] See, *Jefferson v. Jones*, 286 Md. 544, 408 A.2d 1036 (1979); 67A Am. Jur. 2d *Sales* § 710 (2014).

McCoolidge with the documentation necessary to complete one of the titling methods in § 60-140.

But the court determined that the sellers gave McCoolidge a registrable certificate sometime in 2011. McCoolidge, the court stated, could have registered one of the certificates in Nebraska but abstained from doing so because he wanted to wait for the outcome of this litigation.

McCoolidge contends that "[t]he fact that [he] was eventually provided with a document which he could register in Nebraska does not cure the earlier breach."[14] "The ability to register a vehicle," McCoolidge asserts, "is not even remotely the same as 'good title . . . .'"[15] He identifies two defects that remained despite his ability to register the certificate of title: (1) the lack of a bill of sale or similar documentation and (2) the presence on the certificate of title of a third party who was "a complete stranger to the transaction."[16]

[5,6] McCoolidge is correct that the buyer's ability to obtain a certificate of title stating that he is the owner is not always dispositive in warranty of title cases.[17] But we need not decide whether a shadow remained over McCoolidge's title, because he failed to show what damages, if any, he incurred from the alleged breach. Buyers asserting a breach of warranty under the Uniform Commercial Code must not only prove the warranty and breach thereof, but also the cause of their loss and the extent of their damages.[18] They do not have to prove damages with mathematical certainty, but the evidence must be

---

[14] Reply brief for appellant at 2.

[15] *Id.*

[16] Brief for appellant at 5.

[17] See, *Colton v. Decker, supra* note 7; *Jefferson v. Jones, supra* note 13; 1 James J. White et al., Uniform Commercial Code § 10:41 (6th ed. 2012).

[18] See *Settell's, Inc. v. Pitney Bowes, Inc.*, 209 Neb. 26, 305 N.W.2d 896 (1981).

sufficient to allow the trier of fact to estimate the actual damages with reasonable certainty.[19]

[7] If the buyer accepts defective goods, damages are measured under Neb. U.C.C. § 2-714 (Reissue 2001). The court determined that the measure of damages in § 2-714(2) applied, thus implicitly finding that McCoolidge had accepted the Element—although he clearly never accepted the sufficiency of any of the certificates of title. The record supports a finding that McCoolidge did not effectively reject the Element.[20] For example, McCoolidge testified that he never tried to "just send [the Element] back." Furthermore, he did not allege in his complaint that he rejected or revoked his acceptance of the Element and he never claimed that he was entitled to recover the purchase price.[21]

As with other breaches of warranty, § 2-714 is the usual starting place for measuring damages for breach of the warranty of title.[22] Section 2-714 provides:

> (1) Where the buyer has accepted goods and given notification [of the breach to the seller] he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.
>
> (2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

---

[19] *Id.*

[20] See Neb. U.C.C. §§ 2-602 and 2-606(1)(b) (Reissue 2001).

[21] See Neb. U.C.C. § 2-711(1) (Reissue 2001).

[22] See *Metalcraft, Inc. v. Pratt*, 65 Md. App. 281, 500 A.2d 329 (1985).

(3) In a proper case[,] any incidental and conse-
quential damages under the next section may also be
recovered.

We have referred to the difference between the value of the
goods as accepted and the value as warranted under § 2-714(2)
as "'the keystone for computing buyer's damages.'"[23]

McCoolidge established the purchase price of the Element,
which is strong evidence of its value as warranted.[24] For the
value as accepted, McCoolidge argues that the Element "has
absolutely no value to [him] without a clear chain of own-
ership and good title."[25] Some breaches of the warranty of
title may render the value of the accepted goods zero.[26] But
McCoolidge did not show that the Element was worthless
to him, at least after he received a certificate of title that he
could register in Nebraska. He presented no evidence what-
soever of how the lack of a bill of sale and the presence of
a "third party" on the certificate of title affected the value of
the Element.

Similarly, the court did not err by denying McCoolidge
damages for the money he spent repairing the Element's
structural damage. McCoolidge argues that because he "has
not and will not receive good title, the repairs were wasted
on a vehicle that he cannot use."[27] If a buyer repairs a motor
vehicle without good title, courts generally consider repairs
as evidence of the vehicle's value under a temporally modi-
fied calculation of diminution in value under § 2-714(2).[28]

---

[23] *Settell's, Inc. v. Pitney Bowes, Inc., supra* note 18, 209 Neb. at 30, 305
N.W.2d at 898.

[24] See *id.*

[25] Reply brief for appellant at 7.

[26] 1 White et al., *supra* note 17, § 10:45.

[27] Reply brief for appellant at 9.

[28] See, *Schneidt v. Absey Motors, Inc.*, 248 N.W.2d 792 (N.D. 1976); *Ricklefs
v. Clemens, supra* note 7; Annot., 94 A.L.R.3d 583 (1979). See, also,
*Marino v. Perna*, 165 Misc. 2d 504, 629 N.Y.S.2d 669 (N.Y. Civ. 1995).

But, as noted, McCoolidge did not show how the alleged title defects affected the Element's value. Courts may invoke the "special circumstances" exception in § 2-714(2) to award repair costs as damages.[29] Here, though, the court found there were not special circumstances, and that finding was not clearly wrong.[30]

[8] In addition to damages under § 2-714(2), a buyer may also recover incidental and consequential damages.[31] The existence of "special circumstances" under § 2-714(2) is not a precondition to a buyer's recovery of incidental and consequential damages.[32] Courts invoke the "special circumstances" exception to award damages for repair or replacement costs[33] or, more commonly in warranty of title cases, to shift the valuation date under § 2-714(2) from "the time . . . of acceptance" to the date on which the buyer's possession of the automobile was interrupted because of a title defect.[34] Section 2-714(3) states that a buyer can recover incidental and consequential cases in a "proper case." Such damages are proper when the buyer meets the requirements of Neb. U.C.C. § 2-715 (Reissue 2001).[35]

The recovery of incidental and consequential damages is governed by § 2-715, which provides:

---

[29] See 1 Roy Ryden Anderson, Damages Under the Uniform Commercial Code § 10:10 (2015-16 ed.). See, also, *Hillcrest County Club v. N.D. Judds Co.*, 236 Neb. 233, 461 N.W.2d 55 (1990).

[30] See *Hillcrest County Club v. N.D. Judds Co., supra* note 29.

[31] *Miller v. Stan Ortmeier Constr. Co.*, 229 Neb. 259, 426 N.W.2d 272 (1988).

[32] 1 Anderson, *supra* note 29, § 10:13.

[33] See *id.*, § 10:10.

[34] See, *Marino v. Perna, supra* note 28; *U-J Chevrolet Co., Inc. v. Marcus, supra* note 7; *Schneidt v. Absey Motors, Inc., supra* note 28; *Ricklefs v. Clemens, supra* note 7; 1 Anderson, *supra* note 29, § 10:12; 1 White et al., *supra* note 17, § 11:5 n.3. But see *Masoud v. Ban Credit Service Agency*, 128 Misc. 2d 642, 494 N.Y.S.2d 598 (N.Y. Sup. 1985).

[35] See 1 Anderson, *supra* note 29, § 10:13.

(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

(2) Consequential damages resulting from the seller's breach include

(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(b) injury to person or property proximately resulting from any breach of warranty.

McCoolidge argues that he should receive damages for storing the Element. Incidental damages include the cost of storing defective goods.[36] But McCoolidge did not actually pay to store the Element, and Monteith's testimony suggests that he is under no obligation to do so. McCoolidge responds that the absence of actual expenses is "irrelevant as he forfeited the benefit of the space used for storage" and that he is "entitled to the reasonable value of storing the vehicle."[37] Any loss sustained by Cars on Keystone from storing the Element was sustained by the corporate entity doing business as Cars on Keystone.[38] McCoolidge did not show how such a loss affected his "profit interest" in the company. As to the period during which McCoolidge stored the Element at his personal residence, the court could find that evidence of the cost of

---

[36] 2 Roy Ryden Anderson, Damages Under the Uniform Commercial Code § 11:6 (2015-16 ed.).

[37] Brief for appellant at 10.

[38] See *Steinhausen v. HomeServices of Neb.*, 289 Neb. 927, 857 N.W.2d 816 (2015).

storing a vehicle at Cars on Keystone or the county impound lot did not reflect McCoolidge's actual loss.

McCoolidge also argues that uncertainty about the Element's title caused him to lose access to a free motorized wheelchair ramp. Such a loss would be an item of consequential damages.[39] Under § 2-715(2)(a), the buyer cannot recover consequential damages if he could have reasonably prevented the loss by cover or otherwise. Here, the court found that McCoolidge could have stored the equipment until he received good title. Furthermore, the buyer must make his particular needs generally known to the seller to charge the seller with knowledge under § 2-715(2)(a).[40] McCoolidge testified that he told Oyvetsky that he had multiple sclerosis and "that's why I wanted a Honda Element." But there is no evidence that McCoolidge made known to the sellers that he had time-sensitive access to free accessibility equipment.

[9] McCoolidge also claims damages for the loss of use of the Element. Loss of use is another example of consequential damages.[41] We have said that the reasonable value of the loss of use of a motor vehicle is generally the fair rental value of a like vehicle for a reasonable length of time or the amount actually paid, whichever is less.[42]

McCoolidge's failure to actually rent another vehicle is not necessarily fatal to his claim for loss of use damages. Most courts award loss of use damages even if the plaintiff did

[39] See *Adams v. American Cyanamid Co.*, 1 Neb. App. 337, 498 N.W.2d 577 (1992).

[40] See § 2-715, comment 3.

[41] See, *World Enterprises, Inc. v. Midcoast Aviation*, 713 S.W.2d 606 (Mo. App. 1986); 2 Anderson, *supra* note 36, § 11:33. But see *Midwest Mobile Diagnostic Imaging v. Dynamics Corp.*, 965 F. Supp. 1003 (W.D. Mich. 1997).

[42] See, *Chlopek v. Schmall*, 224 Neb. 78, 396 N.W.2d 103 (1986); *Rose v. United States Nat. Bank*, 218 Neb. 97, 352 N.W.2d 594 (1984); *Husebo v. Ambrosia, Ltd.*, 204 Neb. 499, 283 N.W.2d 45 (1979).

not actually rent a substitute chattel,[43] at least if the chattel was for personal use.[44] Those who lack the means to rent a vehicle may nevertheless be inconvenienced and should not be barred from recovering damages because of their financial circumstances.[45]

[10] But McCoolidge could only recover damages for loss of use for "a reasonable length of time."[46] A reasonable length of time depends on the facts of the case,[47] but should generally correspond to the length of time the buyer would have used the vehicle but for the breach of warranty.[48] McCoolidge bought the Element knowing that repairs were necessary because the roof was "caved in." He also planned to install a motorized wheelchair ramp. He did not show how long the Element would have been inoperable because of the expected repairs and modifications, apart from the difficulties

---

[43] *Warren v. Heartland Auto. Services, Inc.*, 36 Kan. App. 758, 144 P.3d 73 (2006); *Castillo v. Atlanta Cas. Co.*, 939 P.2d 1204 (Utah App. 1997); *United Truck Rental v. Kleenco Corp.*, 84 Haw. 86, 929 P.2d 99 (1996); *Cress v. Scott*, 117 N.M. 3, 868 P.2d 648 (1994); *Camaraza v. Bellavia Buick Corp.*, 216 N.J. Super. 263, 523 A.2d 669 (1987); *Francis v. Steve Johnson Pontiac-GMC-Jeep*, 724 P.2d 84 (Colo. App. 1986); *Luna v. North Star Dodge Sales, Inc.*, 667 S.W.2d 115 (Tex. 1984); *Mountain View Coach v Storms*, 102 A.D.2d 663, 476 N.Y.S.2d 918 (N.Y. Sup. 1984); *Jacobs v. Rosemount Dodge-Winnebago South*, 310 N.W.2d 71 (Minn. 1981); *Meakin v. Dreier*, 209 So. 2d 252 (Fla. App. 1968); Annot., 18 A.L.R.3d 497, § 13 (1968). See, also, 2 Anderson, *supra* note 36, § 11:33. But see *Winchester v. McCulloch Bros. Garage*, 388 So. 2d 927 (Ala. 1980).

[44] See *PurCo Fleet Services, Inc. v. Koenig*, 240 P.3d 435 (Colo. App. 2010).

[45] See *United Truck Rental v. Kleenco Corp., supra* note 43; *Luna v. North Star Dodge Sales, Inc., supra* note 43.

[46] *Rose v. United States Nat. Bank, supra* note 42, 218 Neb. at 100, 352 N.W.2d at 597. Accord *Husebo v. Ambrosia, Ltd., supra* note 42.

[47] See *Husebo v. Ambrosia, Ltd., supra* note 42.

[48] See, *Warren v. Heartland Auto. Services, Inc., supra* note 43; *Seekings v. Jimmy GMC of Tucson, Inc.*, 130 Ariz. 596, 638 P.2d 210 (1981); 18 A.L.R.3d, *supra* note 43, § 18.

caused by the lack of good title. McCoolidge did not have to prove the exact date on which he would have begun to drive the Element if the sellers gave him satisfactory title,[49] but awarding loss of use damages on the record before us would require speculation.

Finally, McCoolidge argues that he is entitled to the costs he incurred "in an attempt to obtain a clear title."[50] He does not explain what these costs were, and after reviewing the record, we do not think that the amount of such costs would have been apparent to the court.

## CONCLUSION

The court determined that the sellers breached the warranty of title by failing to deliver a registrable certificate of title to McCoolidge. Even after he received a registrable certificate, McCoolidge claims that the lack of a bill of sale and the presence of a "third party" on the certificate cast a shadow on his title. But McCoolidge did not prove the damages he suffered from these defects. We therefore affirm the court's judgment for the defendants.

Affirmed.

---

[49] See *Settell's, Inc. v. Pitney Bowes, Inc., supra* note 18.

[50] Brief for appellant at 11.