L. ALFORD, APPELLANT, V. JOHN L. NEAL ET AL., APPELLEES.
425 N.W.2d 325

Filed July 1, 1988.   No. 86-614.

James E. Schneider and Allen L. Fugate, of Schneider, Fugate & Griffin, P.C., for appellant.

Donald W. Pederson, of Murphy, Pederson, Piccolo & Pederson, for appellees.

BOSLAUGH, WHITE, and SHANAHAN, JJ., and SPRAGUE and THOMPSON, D. JJ.

WHITE, J.

This is a replevin action brought by the plaintiff-appellant, L. Alford, against the defendants-appellees, John L., Wilma A., James W., and Bonnie L. Neal, to recover possession of certain personal property purchased at a public auction. The case was tried to the court without a jury. Alford appeals from an order of the district court finding that the plaintiff failed to prove ownership of the property and that he was not entitled to possession of the same.

In January of 1982 John and Wilma Neal and the North Platte State Bank entered into a voluntary liquidation agreement whereby the Neals agreed to hold a public auction sale of their personal property, consisting primarily of farm equipment and livestock, and to list their real estate for sale at a mutually agreed price. On February 17, 1982, the plaintiff, Alford, purchased part of the real estate owned by the Neals. A public auction of the Neals' personal property was conducted on February 18, 1982. By agreement, John and Wilma Neal were precluded from bidding at the auction; however, their son, James Neal, was allowed to bid. Alford testified that just prior to the auction he had a conversation with James Neal and Wilma Neal, at which time he informed the two that he had $150,000 available to purchase enough equipment and livestock to operate the farm which he had purchased the day before. According to Alford, the parties all agreed that Wilma Neal would continue to keep the books and James Neal would do the farming. James Neal was to bid at the sale, and Wilma Neal was to keep a tabulation of the amount of the bids. It was not

disclosed at the auction that James Neal was bidding as an agent. The total amount of the successful bids made by James Neal was $234,488. Included in the purchase were a number of motor vehicles, as defined in Neb. Rev. Stat. § 60-301(1) (Reissue 1984). Alford agreed to pay the amount despite the fact that it was considerably more than the original $150,000 figure.

On a counter check drawn on First National Bank and Trust Company of North Platte, Alford filled in the date, the payee auction company, and the amount of $234,488. Upon Alford's direction, James Neal signed the counter check. The next day Alford and James Neal went to the First National Bank and Trust Company and opened an account upon which the counter check could be drawn. The title of the account was Neal Farms, Inc. The account number was later added to the counter check by a representative of the auction company. Alford deposited $240,000 into the new account by drawing a check on his personal account. Alford testified that he did not intend to make a gift of the $240,000 to the Neals. The payee on the check was Neal Farms, Inc., and the check was endorsed "Neal Farms Inc. by James W. Neal." On the front of the check Alford wrote "Items Purchased @ Sale." The auction company then made a check payable to John Neal and the North Platte State Bank jointly in an amount representing the proceeds from the sale less the auction fee. John Neal endorsed the check, which was presumably applied to reduce his debt with North Platte State Bank. After the sale Alford attempted to help the Neals obtain a loan to buy back the real estate and personal property which he had purchased from them. Attempts to obtain such financing were unsuccessful.

From the time of the auction until the filing of this lawsuit, none of the titles to the motor vehicles in question were transferred from John Neal to Alford. These titles, however, had been previously assigned to the North Platte State Bank. Alford filed this action in May of 1984, after he learned that John Neal had encumbered some of the property.

The defense introduced documentary evidence which indicated that the parties treated the property as belonging to the Neals, but encumbered in the amount of Alford's

investment. Neals' 1982 tax records show that they claimed deductions for depreciation of many of the items involved in the sale. Alford admitted that he had seen the Neals' 1982 tax return in connection with his attempts to obtain financing for the Neals. Exhibit 29 is part of a loan application prepared by Alford on behalf of John and Wilma Neal. A section entitled "Financial Statement as of August, 1983" lists the Neals' assets as 320 acres of land and a leasehold, together valued at $675,000; farm machinery and equipment valued at $375,650; and other personal property, including growing crops and feed, valued at $268,000. A breakdown of the farm equipment lists most, if not all, of the items purchased at the sale. Alford is purported to have a lien on the real estate in the amount of $600,000. No lien by Alford is asserted on the chattels and crops. Exhibit 38 is another financial statement prepared by Alford for the Neals. The statement listed machinery and equipment valued at $205,000 as of September 1982. Once again, many of the items listed were the same as those purchased at the auction. No mention is made of any lien against the personal property.

Other evidence tending to show that Alford was a creditor of the Neals was also presented. Alford never requested any of the proceeds from the sales of hogs after the auction. The parties did not transfer title to the motor vehicles, as required by Neb. Rev. Stat. § 60-104 (Reissue 1984).

The plaintiff introduced documentary evidence which tended to show that he had indeed purchased the items and that no loan of any sort was intended. A sales slip was received indicating the items purchased by James Neal at the auction, the total amount of which was $234,488. Copies of the counter checks used in the transaction were also received. As previously stated, on the check payable to Neal Farms, Inc., Alford wrote "Items Purchased @ Sale." Exhibit 1 is a request for loan information filled out by Alford in which he describes the transaction as a purchase. This exhibit was not received into evidence and will therefore not be considered.

Testimony of the defendants also supports the plaintiff's claim that no loan was intended. On cross-examination, John Neal testified as follows:

Q Now, is it your contention, sir, that a sum of money was borrowed from Mr. Alford to use to purchase that equipment at the sale and the chattels that were purchased, as reflected by Exhibit 18?

A We didn't borrow any money from him.

Q Okay. That means you, your wife, your son and your daughter-in-law; is that correct?

A That's correct.

Also on cross-examination, James Neal testified as follows:

Q All right. Now, sir, did you personally enter into a loan agreement with Mr. Alford, to loan you $240,000.00?

A No, I did not.

Q Are you indebted in any way — do you consider yourself, in any way, personally indebted to Mr. Alford for this $240,000.00?

A No, I do not.

Both John and James Neal admitted that Alford furnished the money to purchase the subject personal property. John Neal testified as follows:

Q Now, did you ever deny, sir, that Mr. Alford furnished the money that was used to purchase the chattels that were purchased on the day of the sale . . . ?

. . . .

A No, I don't deny it.

James Neal testified as follows:

Q And who provided that $240,000.00?

A I believe Mr. Alford did.

. . . .

Q Now, did you ever take the position, under oath, that you don't know whether or not Mr. Alford put up the money for the purchase of the equipment at the sale?

A Well, I know he put up the money.

Alford's 11 assignments of error center around the contention that the district court erred in failing to find that he was the owner of the property and entitled to possession. For the reasons stated hereafter, we agree with the plaintiff-appellant and reverse.

The district court stated the reasoning for its judgment as follows:

The Court finds, based on the evidence adduced at trial, that all of the actions of the plaintiff were inimical to a claim of ownership. He helped prepare documents which listed the property in question as that of the defendant. On Exhibit 29 which also listed the equipment as that of the defendant, the plaintiff was listed as only claiming a lien on real estate and not upon chattels or crops. There is further evidence that the plaintiff knew the defendants were claiming the depreciation upon the property on their income tax statements and no protest was lodged. The plaintiff allowed some of the purchased property to be sold without protest. The plaintiff did not comply with Section 60-105 R.R.S. 1943 by taking the title to any of the motor vehicles or endorsing any lien upon the title to any motor vehicles purchased. No security agreements were executed nor were any security agreements or documents filed with the County Clerk in McPherson County on any of the property. Absolutely no action was taken for a period of more than two years by the plaintiff to exercise any control over the property in question.

There is no question in the Court's mind that the defendants are indebted to the plaintiff for the sum of $240,000.00. However, there is also no question in the Court's mind that the plaintiff has failed to prove ownership or a special ownership or interest in the property in question and that he is entitled to possession of those items.

In a replevin action tried without a jury, the findings and disposition of the trial court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Ford v. Jordan*, 220 Neb. 492, 370 N.W.2d 714 (1985).

Because the defendants did not contest the fact that it was Alford's money which was used to purchase the livestock and equipment, we believe the only issue left to be resolved by the trial court was whether the transaction was intended as a loan or a purchase with a promise to resell.

If the items were purchased by James Neal with Alford's money for John Neal, as the defendants contend, then the

Neals are indebted to Alford in the amount of $240,000. The difficulty with this position is apparent. First of all, John Neal was himself precluded from bidding by agreement with the bank. Bidding through an undisclosed agent would have been a breach of that agreement and also in contravention of the common-law rule that the owner of the property, at whose instance the sale is held, may not bid, either directly or indirectly, unless notice is given that such option is reserved in the seller. See 7 Am. Jur. 2d *Auctions and Auctioneers* § 19 (1980). See, also, Neb. U.C.C. § 2-328(4) (Reissue 1980). Furthermore, this position is inconsistent with the defendants' own testimony that the transaction was not intended as a loan.

If, on the other hand, the transaction was intended as a purchase with a promise to resell, then title passed to Alford at the time of contracting. Neb. U.C.C. § 2-401(3)(b) (Reissue 1980). Under this scenario James Neal acted as a purchasing agent for Alford, and after the purchase the parties entered into a bailment agreement, or, at the very least, their actions gave rise to a constructive bailment, which was breached when John Neal encumbered the property. Alford, as bailor, was then entitled to bring an action in replevin because the Neals, as bailees, impugned Alford's title to the property by claiming ownership of the property. *Jones et ux. v. Stiffler, Appellant,* 137 Pa. Super. 133, 8 A.2d 455 (1939).

The trial court's judgment "that the defendants are indebted to the plaintiff for the sum of $240,000.00" is contradicted by James Neal's and John Neal's testimony to the contrary. The effect of such an admission was discussed in *Southwestern Truck Sales & Rental Co. v. Johnson,* 165 Neb. 407, 417, 85 N.W.2d 705, 711 (1957):

> [W]here a party testifies clearly and unequivocally to a fact which is within his own knowledge, such testimony may be considered as a judicial admission. That rule has particular application where, as here, the parties so testifying made no effort to retract, qualify, or otherwise explain the positive force of their own evidence. [Citations omitted.]

See, also, *Sacco v. Gau,* 188 Neb. 808, 199 N.W.2d 605 (1972). We believe that the Neals' testimony was unequivocal in nature

and therefore constituted a judicial admission conclusive as against them. See *Modern Plumbing & Heating, Inc. v. Journey West Campground, Inc.*, 193 Neb. 781, 229 N.W.2d 192 (1975). The evidence introduced by the defendants that tended to show something other than a purchase by Alford was intended was therefore incompetent and should not have been considered by the trial court. We can come to no other conclusion but that Alford purchased the items at the auction. The trial court's conclusion to the contrary was clearly wrong.

The defendants' testimony, together with the plaintiff's evidence, was sufficient to prove ownership in Alford with respect to those items that were not motor vehicles. Because proof of ownership of the motor vehicles involves the certificate of title act, this matter must be considered separately.

Neb. Rev. Stat. § 60-105(1) (Reissue 1984) of the Nebraska certificate of title act states:

> No person . . . acquiring a motor vehicle . . . shall acquire any right, title, claim, or interest in or to such motor vehicle . . . until he shall have had delivered to him physical possession of such motor vehicle . . . and a certificate of title or a manufacturer's or importer's certificate duly executed in accordance with the provisions of this act, and with such assignments thereon as may be necessary to show title in the purchaser thereof or an instrument in writing required by section 60-1417 . . . . No court in any case at law or in equity shall recognize the right, title, claim, or interest of any person in or to any motor vehicle . . . sold or disposed of, or mortgaged or encumbered, unless there is compliance with this section.

At the same time, § 2-401 states: "(3) Unless otherwise explicitly agreed where delivery is to be made without moving the goods . . . (b) if the goods are at the time of contracting already identified and no documents are to be delivered, title passes at the time and place of contracting."

Recently, in *Worley v. Schaefer*, 228 Neb. 484, 486, 423 N.W.2d 748, 749 (1988), we said:

> In *Dugdale of Nebraska v. First State Bank*, 227 Neb. 729, 732, 420 N.W.2d 273, 276 (1988), this court for the first time acknowledged that "the provisions of Neb.

U.C.C. art. 2 (Reissue 1980) governing sales are applicable to the sale of a motor vehicle." Until *Dugdale*, cases involving motor vehicle sales disputes were resolved solely by application of the relevant, and sometimes not so relevant, provisions of the Nebraska certificate of title act. [Citations omitted.] Thus, by recognizing that motor vehicles are "goods" within the definition provided by Neb. U.C.C. art. 2 (Reissue 1980), *Dugdale* set the stage for future cases which necessarily involve competing and conflicting clauses and provisions of the Uniform Commercial Code and the title act.

We are here once again confronted with such a situation.

We have previously been called upon to construe § 60-105 in motor vehicle replevin and conversion actions. See, e.g., *First Nat. Bank & Trust Co. v. Ohio Cas. Ins. Co.*, 196 Neb. 595, 244 N.W.2d 209 (1976); *First Nat. Bank v. Provident Finance Co.*, 176 Neb. 45, 125 N.W.2d 78 (1963); *Snyder v. Lincoln*, 156 Neb. 190, 55 N.W.2d 614 (1952). Of all such cases considered, none have involved an action to determine the question of ownership as between the buyer and seller of a motor vehicle. As such, this is a case of first impression in Nebraska.

Though not on point, the existing case law is somewhat helpful. A common principle intertwined throughout the above cited cases was painstakingly demonstrated in *First Nat. Bank & Trust Co. v. Ohio Cas. Ins. Co., supra*, wherein we said: "Under the Nebraska Certificate of Title act, sections 60-102 to 60-117, R.R.S. 1943, a certificate of title is the exclusive method provided by statute for the transfer of title to an automobile, *but it is not conclusive of ownership*." (Emphasis supplied.) (Syllabus of the court.) *First Nat. Bank & Trust* involved the rights to a stolen motor vehicle as between the true owner and a subsequent bona fide purchaser. On these facts we observed that "[t]o hold that a certificate of title procured by theft, forgery, fraud, or misrepresentation is conclusive [of ownership] would defeat the very purpose of the legislation." *Id.* at 599, 244 N.W.2d at 213.

This principle was discussed in a more broad sense by Professor Grant Gilmore in a chapter of his treatise on security interests in personal property devoted to perfection of security

interests under the various types of certificate of title acts.

Many of the certificate of title acts provide that no interest of any kind in a vehicle subject to the act shall be recognized unless evidenced by possession of, or notation on, a certificate. [Citing the Ohio certificate of title act upon which the Nebraska certificate of title act is based.] The converse of this proposition is, of course, that anyone who has the certificate, or whose lien is noted on it, is in an impregnable position against all competing claimants who have not brought themselves within the protection of the act. Both the "no interest without a certificate" provision and the converse that "he who has a certificate has everything" are attempts to provide simple, mechanical solutions to obscure and difficult problems. Statutes of frauds and the parol evidence rule furnish convenient historical analogies. Difficult problems are not so easily banished; the fate of such statutory "solutions" is, in the first instance, to provoke an inordinate amount of litigation and, ultimately, to be construed, for all practical purposes, out of existence.

Neither the statutory provision nor its converse could be literally applied without leading to something like chaos. So far as "no interest without a certificate" goes, it has been, is and no doubt will continue to be a fact of life—the title acts to the contrary notwithstanding—that people acquire interests in cars which the law ought to protect (unless the law is an ass) even though the interests are not properly evidenced by or on certificates. So far as "he who has a certificate has everything" goes, that would serve in many situations, if literally applied, to reverse the whole elaborate structure of priorities which, implicit in pre-Code law, becomes explicit under Article 9 of the Code.

Thirty or forty years of litigation under the title acts have brought the process of statutory disembowelment well along. The volume of litigation still continues heavy; reading the current crop of title cases is one of the less attractive chores that must be performed by anyone unwise enough to undertake the preparation of a book

like this. But the consensus that gradually begins to emerge from the cases is the one that an astute observer would have predicted from the beginning: no interest will be recognized which is not evidenced by a certificate unless, on principles of law, equity and natural justice, it ought to be recognized even without the certificate; he who has the certificate has everything unless sound reasons of policy compel his subordination.

1 G. Gilmore, Security Interests in Personal Property § 20.1 at 554-55 (1965).

Courts in other jurisdictions governed by invalidating provisions such as § 60-105 have considered the effect of such a statute in the situation we have here. The majority of these courts have recognized that the principle discussed in *First Nat. Bank & Trust Co. v. Ohio Cas. Ins. Co.*, 196 Neb. 595, 244 N.W.2d 209 (1976), and in Professor Gilmore's text applies equally as well where one party to a motor vehicle purchase agreement is in breach. Such courts have held that, as between the buyer and seller, nondelivery of the certificate of title does not prevent change of ownership. *Sandhorst v. Mauk's Transfer, Inc.*, 252 N.W.2d 393 (Iowa 1977); *Couch v. Cockroft*, 490 S.W.2d 713 (Tenn. App. 1972); *Bunch v. Signal Oil and Gas Company*, 505 P.2d 41 (Colo. App. 1972); *Johnson v. Safeco Insurance Company*, 464 S.W.2d 164 (Tex. Civ. App. 1971).

Based upon all of these precedents, we hold that, as between the buyer and seller of a motor vehicle, the certificate of title is prima facie evidence, but is not conclusive proof of ownership under the Nebraska certificate of title act. To say otherwise would unjustly enrich those unscrupulous sellers inclined to withhold certificates of title after successfully procuring the amount of the purchase price from an unwitting buyer. Surely our Legislature never intended such a result.

As construed, § 60-105 does not conflict with § 2-401, but leaves a void which § 2-401 fills; that is, in the situation where a seller wrongfully refuses delivery of the certificate, when does title pass? Section 2-401 will answer this question in light of the particular circumstances of the sales transaction. On the facts of this case, title passed at the time of contracting because

delivery was to be made without moving the goods.

We hold that Alford was the owner of the disputed personal property, including the motor vehicles, and was entitled to possession of the same. The cause is reversed and remanded with directions to enter an order accordingly.

REVERSED AND REMANDED
WITH DIRECTIONS.