Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/20/2024 09:06 AM CST

Dylan R. Isham, appellant, v.
Billy C. Jack, appellee.

___ N.W.2d ___

Filed February 13, 2024.    No. A-22-880.

1. **Specific Performance: Equity: Appeal and Error.** An action for specific performance sounds in equity, and on appeal, an appellate court tries factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent from the conclusion reached by the trial court.
2. **Replevin: Judgments: Appeal and Error.** In a replevin action tried without a jury, the findings and disposition of the trial court have the effect of a jury verdict and will not be disturbed unless clearly wrong.
3. **Specific Performance: Contracts.** Specific performance may be granted only where there is a valid, legally enforceable contract and the party seeking specific performance has substantially complied with the terms of that contract.
4. **Options to Buy or Sell: Real Estate: Contracts: Sales.** An option to purchase realty in and of itself does not create a binding obligation to either sell or purchase the realty; however, once an option to purchase is exercised, it becomes a contract for the purchase and sale of the realty.
5. **Waiver: Words and Phrases.** Waiver is a voluntary and intentional relinquishment or abandonment of a known existing legal right or such conduct as warrants an inference of the relinquishment of such right.
6. **Contracts: Waiver: Proof.** A written contract may be waived in whole or in part, either directly or inferentially, and the waiver may be proved by express declarations manifesting the intent not to claim the advantage, or by so neglecting and failing to act as to induce the belief that it was the intention to waive.
7. **Replevin: Proof.** In a replevin case, the plaintiff has the burden to prove by a preponderance of the evidence that at the time of the commencement of the action (1) the plaintiff was the owner of the property

sought, (2) the plaintiff was entitled to immediate possession of the property, and (3) the defendant wrongfully detained it.

8. **Replevin: Abandonment.** Abandonment is a complete defense to a replevin action.

9. **Abandonment: Proof: Words and Phrases.** Abandonment is the voluntary and intentional relinquishment of a right to property, and the evidence proving abandonment must be clear and convincing.

Appeal from the District Court for Butler County: Christina M. Marroquin, Judge. Affirmed.

George H. Moyer, of Moyer, Moyer & Lafleur, for appellant.

Billy C. Jack, pro se.

Riedmann, Bishop, and Welch, Judges.

Bishop, Judge.

## INTRODUCTION

Dylan R. Isham appeals the decision of the Butler County District Court that denied his complaint against Billy C. Jack regarding possession of a garage after finding that Isham had abandoned the garage and that it would be inequitable to allow him to remove the garage. We affirm.

## BACKGROUND

On July 8, 2021, Isham filed a complaint against Jack regarding possession of a garage owned by Isham. Isham alleged that on May 11, 2019, he and Jack contracted and agreed to exchange manufactured/mobile homes. Specifically, Isham agreed to trade his "1973 Shar-Lo manufactured home" for Jack's "1988 Skamper 305F mobile home," and each party accepted the other's manufactured/mobile home "'as is'"; "the trade was even, 'no money exchanged.'" Isham alleged that there was a "frame two-car garage" attached to his manufactured home, which garage was expressly excluded from the trade, but that Jack was given the option to purchase the garage for $3,000 and could exercise that option any time prior to and including May 11, 2020. Isham alleged that Jack

failed to exercise the option and that when Isham attempted to remove the garage, Jack claimed it was his and called law enforcement. In his complaint, Isham sought "specific performance of the agreement" between Isham and Jack, asked the district court to "decree that [Isham] is entitled to possession of the two-car garage and issue a writ of assistance to place [Isham] in possession thereof, for damages for wrongful detention, for his costs expended and such other and further relief as equity requires."

In his pro se response, Jack claimed that he sent Isham a text message on June 3, 2019, notifying Isham that he did not want to purchase the garage and asking Isham to remove the garage. Isham did not respond to Jack's text message, and after several months, Jack considered the garage abandoned and proceeded with repairs to the garage. Jack alleged that he did not receive any communication from Isham until February 25, 2021—more than 20 months after Jack notified Isham to remove the garage and 9 months after the final option date stated in the parties' contract. Isham demanded full payment or the immediate removal of the structure, but Jack notified Isham that the property was abandoned and that he had proceeded with repairs and integrated the garage into the existing manufactured home. Jack alleged that he received a demand letter from Isham's attorney on June 10, demanding $5,000 "for the structure and 'rent,'" but after Jack contacted Isham's attorney to explain that Isham had abandoned the property, Jack received notification of the lawsuit on July 25. Jack asked the district court to dismiss Isham's lawsuit because "[Isham] is asking for relief from the court that is a direct cause of his own negligence." Jack alleged that "[i]t is reasonable to assume that after 12 months of waiting [Isham] no longer had any interest in [the] structure and was abandoning [it]."

Trial was held on August 16, 2022. Isham appeared with counsel, and Jack appeared pro se. Isham testified in his own behalf and called two witnesses to testify on his behalf. Several exhibits were also received into evidence. Jack did

not testify, nor did he call any witnesses to testify, but he did elicit evidence through his cross-examination of Isham and the witnesses called by Isham.

Wendy Isham (Wendy), Isham's mother, testified that she purchased the manufactured home, including the garage, in 2014. She said she received a title for the manufactured home and a purchase agreement for the garage. Wendy never lived in the manufactured home, but her son did live there. Isham testified that he moved into the manufactured home in early to mid-2014, and his mother transferred title of the property, including the garage, to him "[w]hen [he] got done paying her back for it," which took him "something like two years." According to Wendy, the manufactured home is titled like a motor vehicle. Wendy said, "The title would have been recorded, and the transfer of the property would have been recorded also because it included the garage."

Subsequently, in 2019, Isham traded the manufactured home to Jack for a mobile home. Isham testified that a friend of his knew he was looking to get out of the manufactured home and purchase a different house. That friend introduced Isham to Jack, who was living in a small fifth-wheel trailer but needed a bigger space for his family. In addition to having some face-to-face conversations, Isham and Jack began communicating through text messages and Facebook, and eventually, they agreed to trade homes. Isham testified that "I wanted to buy a bigger home for myself, so I thought this camper, I can move to my parents' property and still have the space for myself while I save money for my own home," and that "I thought in the process, if I can help somebody else out, so be it."

Wendy testified that she helped Isham draft the "Purchase Agreement," which was received into evidence and states:

> I . . . Isham trade my 1973 SHAR-LO MFGD home
> VIN# . . . " AS IS" located at . . . Lakeside Estates to
> . . . Jack for his 1988 Skamper 305F mobile home VIN#
> . . . "AS IS" and removed from Lakeside Estates. An

even trade for my MFGD home and the mobile home is agreed with no money exchanged.

. . . Jack will be responsible for the lot rent charged by Lakeside Estates beginning May 1, 2019[.]

**This trade of MFGD home and mobile home <u>excludes</u> the MFGD home's attached 2 car garage owned by . . . Isham located at . . . Lakeside Estates. . . . Jack has the option to purchase the attached 2 car garage for the amount of $ 3000.00 until May 11, 2020. If the attached 2 car garage is not purchased and paid in full by May 11, 2020, . . . Isham will remove the attached 2 car garage from . . . Lakeside Estates.

(Emphasis in original.) The purchase agreement was signed by Isham and Jack on May 11, 2019. Wendy testified that it was her understanding that Jack had a deadline to pay for the garage if he wanted it, but "we did not have a deadline to remove the garage."

Jack sent Isham a text message on June 3, 2019, stating, "Hey I'm gonna pass on the garage with the price and what it will take to fix it I think it's just to much..I need to get it moved out soon tho so I can get other stuff done." Isham testified that he remembered seeing the text message "at some point," but he "did not see it June 3rd." When asked when he saw the message, Isham responded, "I would say sometime within a month."

Isham was asked if he tried to contact Jack about moving the garage after the option to purchase it expired on May 11, 2020. Isham said, "I remember I looked him up on Facebook, because a lot of [the original] messages . . . were through Facebook, [but] I couldn't find a profile anymore," so "I assumed he had blocked me." When asked again if he tried to contact Jack, Isham said, "Yes," "[t]hrough Facebook." When asked if he went over and knocked on Jack's door, Isham said, "[N]o, I did not go to his home; I didn't feel like that would be appropriate."

Isham testified that in 2020, he contacted William Scribner of "Scrib's House Moving" "probably three or four times" and his mother contacted Scribner multiple times about moving the garage, but Scribner always responded that he was not available to move the garage because he could not find labor due to the COVID-19 pandemic. When asked if he waited for Jack's option to purchase to expire, Isham responded, "I had talked to . . . Scribner before I think it totally expired," but "I think at that point I couldn't afford it." When his counsel asked, "Well, what I'm getting at here is . . . Jack [had] an option to purchase the garage . . . until May 11, 2020[, so] what was your intention with respect to that option?" Isham replied, "To get it moved as soon as I could."

Scribner testified that he owns "Scrib's Moving and Heavy Hauling." Scribner stated that he was contacted by Isham's mother and father "about two or three" different times in 2020 about moving the garage. However, Scribner was not able to move the garage at that time because of an eye injury; he did not have trouble with employees because of the pandemic, he "stayed busy." Scribner did not have a signed contract, so he "never took the option to move [the garage]." On cross-examination, Jack asked Scribner if he would have been able to undertake the job if the Ishams had told him in May 2020 that they wanted to go ahead and get the garage moved. Scribner responded, "I would have. At that point I would have sent my crew to do it; I would not personally have been there." According to Scribner, it would have taken 2 to 3 days to get the garage moved, and most of that time would have been getting the city permit and the required signatures from the utilities.

Isham testified that in February 2021, he had someone lined up to move the garage and contacted Jack via Facebook; "I was able to find his profile at that point." The messages between Isham and Jack were received into evidence. A message from Isham dated February 25, 2021, stated:

Hey been meaning to get ahold of you for a little while now. I was looking over our agreement and 5/11 comes up on 2 years. If u can't get me paid we'll be removing the garage asap. Parents got a new farm property and my garage is better served there. Lmk[.]

Jack's responding messages stated:

Idk how to proceed but I messaged you in June 2019 and let you know that I wasn't interested in it and I had never heard anything back..I have since made repairs and put money into it.

. . . .

I'm sure we can work something out but I don't think it will be $3k and moving the garage now isn't really an option.

After some back and forth on the price, a message from Isham stated:

Honestly I'm gonna have to have a discussion with my parents before I do anything because they have it in mind to get the building to their place. Cutting the price in half is a heavy hit. I'll get back to you in a day or 2.

Jack responded:

Ok..half of the garage is completely finished and is our living room so moving it at this point is completely out of the question. I did let you know shortly after we got it that we were not interested and I had not heard anything back so I assumed you were not interested in it any further..I would like to work something out with you tho.

On February 26, Isham messaged Jack that the price for the garage was "3k," with "1500 . . . tomorrow" and the rest later. Jack responded, "I'm not gonna be able to do anything more on it..I have talked with a lawyer this morning about it and you were notified and I heard nothing for well more than a year." Jack sent another message stating, "I'm sorry..I notified you on June 3rd, 2019 and you have since forfeited with no response." Isham messaged Jack that he would be there

"tomorrow" to take measurements, and Jack responded, "I will call the sheriff if you show up."

Isham was asked about pictures that were received into evidence. Isham testified that exhibit 4 was a picture that his mother took "probably" in April 2021. Isham stated that the picture depicted "an addition" that was being built "between the garage and the trailer that connected it all." Exhibits 6 and 7 were pictures taken by Isham's mother in "late fall, 2021," or "early winter 2022"; Isham agreed when his counsel stated that "it looks like now the breezeway has been sided and connected to the garage." Isham stated, "And also, beyond that, in this picture the garage is now sided." Isham confirmed that exhibits 6 and 7 accurately reflect what the unit looked like at the time of trial.

On cross-examination, Jack noted that Isham previously testified that he did not see the message Jack sent on June 3, 2019, right away. Jack asked Isham why he did not just send him a message once he read the message from June 3 and let Jack know that he was trying to get ahold of Scribner or that he was still interested in getting the garage. Isham responded, "Because I was under the impression that that was your attempt to get one over on me when I went out of my way to help you, and I didn't have the words for it right away. . . . I have never been in a situation like this. So I made mistakes along the way." Jack then asked, "So you didn't have no words for me for 21 months?" And Isham responded, "I just was trying it [sic] find somebody to move it. And within [sic] I found somebody that could is within [sic] I contacted you."

In its order entered on August 31, 2022, the district court stated that Isham sought to enforce the specific term of the parties' contract allowing him to remove the two-car garage. However, the court said it did not agree that the term was enforceable because the facts demonstrate a "clear abandonment" of any interest Isham had in the garage. The court found that Isham demonstrated an intent to abandon the garage when: (1) he failed to communicate with Jack after

Jack indicated he would not be purchasing the garage (and the court found that Isham's testimony that he did not know how to get in touch with Jack following that message was not credible), (2) he was not the party to make arrangements to acquire the garage from the property, and (3) he was solely motivated to obtain the garage for his parents' property.

Additionally, the district court stated:

> It would be inequitable for the Court to enforce a right that . . . Isham has neglected himself to timely enforce to the clear detriment of . . . Jack. The Court acknowledges that the owner of the garage is . . . Isham. While [Isham] contends that the focus is not on due diligence, the law does require that individuals act on their rights. Diligence in exercising one's rights to ownership impact the rights of others. Here, under [Isham's] theory of the case, [he] is the rightful owner of the garage, . . . Jack has never paid the $3000, therefore [Isham] could return at any future time and seek of [sic] writ of assistance for removal. Such an outcome is precluded by equitable theories of justice. What if [Isham's] parents had purchased their new farm in the year 2030? [Isham] cannot sit in waiting on his right and spring into action when it is most convenient; certainly not when it has prejudiced the other party.

The court found that for 20 months Isham took no action to exercise his right to remove the garage, which is now attached to the residential property by a roofline and siding; "[r]emoval of the garage from the property would now require detachment from the residential property and improvement[s] have been made." The court denied Isham's complaint, as well as his subsequent motion for new trial.

Isham appeals.

## ASSIGNMENTS OF ERROR

Isham assigns that the district court erred by (1) refusing him specific performance, (2) finding he had abandoned the

garage, (3) failing to issue process commanding the sheriff of Butler County to assist him in obtaining possession of the garage, and (4) permitting Jack to retain and keep Isham's garage. Jack did not submit a responsive brief on appeal.

## STANDARD OF REVIEW

[1] An action for specific performance sounds in equity, and on appeal, an appellate court tries factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent from the conclusion reached by the trial court. *Walters v. Sporer*, 298 Neb. 536, 905 N.W.2d 70 (2017).

[2] In a replevin action tried without a jury, the findings and disposition of the trial court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Alford v. Neal*, 229 Neb. 67, 425 N.W.2d 325 (1988).

## ANALYSIS

Isham's complaint "pray[ed] for specific performance of the agreement" between the parties and asked the court to "decree that [Isham] is entitled to possession of the two-car garage" and to "issue a writ of assistance to place [Isham] in possession thereof" and "for damages for wrongful detention." We read Isham's complaint as seeking relief under two theories of recovery—one under contract principles (specific performance under the contract) and one under property principles (right to possession of property). We will address each claim in turn.

## No Right to Specific Performance Under Contract

[3,4] Specific performance is a remedy for breach of contract actions. See *Tierney v. Four H Land Co.*, 288 Neb. 586, 852 N.W.2d 292 (2014) (specific performance may be granted only where there is valid, legally enforceable contract and party seeking specific performance has substantially complied with terms of contract). Here, both parties exchanged their

manufactured/mobile homes as set forth in the contract. There was no breach of contract in that regard. The remaining portion of the agreement related to Jack's option to purchase the garage for a certain amount within a certain timeframe. If the option were exercised by Jack, both parties would have been obligated to the terms agreed upon. See, *Struempler v. Peterson*, 190 Neb. 133, 136, 206 N.W.2d 629, 631 (1973) ("[w]hile it may be said that an option to purchase does not in itself create an interest or estate in real estate, there is no question but that upon exercise it becomes a contract for the purchase and sale of the property"); *Marathon Realty Corp. v. Gavin*, 224 Neb. 458, 398 N.W.2d 689 (1987) (option in and of itself does not create binding obligation to either sell or purchase realty; however, once option to purchase is exercised, it becomes contract for purchase and sale of realty); *Widick v. Price*, No. A-18-467, 2019 WL 1779505 (Neb. App. Apr. 23, 2019) (selected for posting to court website) (option to purchase property does not ripen into contract for purchase of property unless and until option is exercised).

In this case, the option was not exercised, and instead, Jack specifically declined the option by a text message sent to Isham within a matter of weeks of signing the agreement; Isham acknowledged seeing the text "within a month." Under the contract, if the option was not exercised, Isham "will remove the attached 2 car garage" from the property. Although no specific deadline was stated for that removal, Isham was nevertheless obligated to remove the garage and had an implied legal right to enter the premises to do so. However, due to the lengthy delay by Isham in responding to Jack about when he would act upon that right, such delay resulted in the conclusion by Jack that Isham was no longer interested in the garage and had forfeited his right to it. The district court noted that Isham was seeking to enforce the specific term of the contract allowing him to remove the garage, but it found that the term was not enforceable because the facts demonstrated a "clear abandonment" of any interest Isham had in

the garage and that "the law does require that individuals act on their rights." We construe the district court's reasoning to mean Isham waived his right to enforce the removal of the garage because he neglected to timely take action to do so to the "clear detriment of . . . Jack."

[5,6] Waiver is a voluntary and intentional relinquishment or abandonment of a known existing legal right or such conduct as warrants an inference of the relinquishment of such right. *Jelsma v. Scottsdale Ins. Co.*, 231 Neb. 657, 437 N.W.2d 778 (1989). A written contract may be waived in whole or in part, either directly or inferentially, and the waiver may be proved by express declarations manifesting the intent not to claim the advantage, or by so neglecting and failing to act as to induce the belief that it was the intention to waive. *Id*.

We agree with the district court that Isham was not entitled to specific performance because he waived his implied contractual right to enter the premises to remove the garage due to his lengthy delay in responding to Jack. Jack sent Isham a text message on June 3, 2019, notifying Isham that he did not want to purchase the garage and requesting that the garage be removed. Isham did not timely respond to the message even though it had been sent to the same phone number used when the parties were formulating their agreement. And although Isham acknowledged receiving the message "within a month" of when Jack sent it, Isham nevertheless waited for over 20 months to respond to Jack's message. Isham's neglect and failure to act can be construed as inducing a belief in Jack that it was Isham's intention to waive his implied right to enter the premises to remove the garage. See *Jelsma v. Scottsdale Ins. Co., supra*.

## No Right to Possession of Garage
## Under Property Principles

Isham's complaint also asked the court to "decree that [Isham] is entitled to possession of the two-car garage" and "for damages for wrongful detention." Therefore, separate

from his claim under the contract, Isham sought relief under a claim of property ownership and right to possession of the same under replevin principles. See *Zelenka v. Pratte*, 300 Neb. 100, 912 N.W.2d 723 (2018) (object of replevin action is to recover specific personal property).

[7-9] In a replevin case, the plaintiff has the burden to prove by a preponderance of the evidence that at the time of the commencement of the action (1) the plaintiff was the owner of the property sought, (2) the plaintiff was entitled to immediate possession of the property, and (3) the defendant wrongfully detained it. *Id*. At trial, Isham claimed that he was the owner of the garage and was entitled to immediate possession of the garage, but that Jack had wrongfully detained the garage. Jack's defense was that Isham had abandoned the garage. In its order, the district court found that Isham was the owner of the garage, but that he was not entitled to possession of the garage because he had abandoned the garage. Abandonment is a complete defense to a replevin action. See 66 Am. Jur. 2d *Replevin* § 32 (2021). See, also, *Graff v. Triple B Development Corp.*, 622 S.W.2d 755 (Mo. App. 1981) (abandonment, if proved, is complete defense to action for replevin and precludes recovery; to constitute abandonment, owner must act with conscious intent neither to use nor retake possession of property). Abandonment is the voluntary and intentional relinquishment of a right to property, and the evidence proving abandonment must be clear and convincing. See *Mueller v. Bohannon*, 256 Neb. 286, 589 N.W.2d 852 (1999).

The evidence at trial established that less than 1 month after the parties executed the May 2019 contract, which included an option to purchase the garage, Jack specifically declined to exercise the option to purchase the garage in a message sent to Isham on June 3, 2019. Jack's message stated: "Hey I'm gonna pass on the garage with the price and what it will take to fix it I think it's just to much..I need to get it moved out soon tho so I can get other stuff done." Isham, who acknowledged receiving the message "within a month" after it was

sent, did not respond to Jack's message or make any attempt to remove the garage at that time. Although Scribner testified that Isham's parents contacted him in 2020 about moving the garage, Isham did not make any contact with Jack about the garage until February 25, 2021. And the timing of that contact, the district court concluded, was "when [Isham's] parents bought a farm," and "another indication" that Isham "was not intending on exercising his rights of ownership" to the garage was that Scribner communicated with Isham's parents, not Isham, about possibly moving the garage. The court found the facts "demonstrate a clear abandonment of any interest in the two-car garage." Based on the record, this finding by the district court was not clearly wrong. See *Alford v. Neal*, 229 Neb. 67, 425 N.W.2d 325 (1988) (in replevin action tried without jury, findings and disposition of trial court have effect of jury verdict and will not be disturbed unless clearly wrong). See, also, *Block v. Fisher*, 103 A.2d 575 (D.C. 1954) (finding that appellant abandoned property he left in appellees' yard for 8 months); *Fleming's Flower Fields v. Schroeder/Klein Investments*, No. A-06-1344, 2008 WL 1747004 *2 (Neb. App. Apr. 8, 2008) (selected for posting to court website) ("[w]here a contract does not provide a time for performance, a reasonable time for performance will by implied by law"; appellants' failure to remove plants for more than 1 year showed their intent to abandon their property).

As stated previously, abandonment is a complete defense to a replevin action. See 66 Am. Jur. 2d, *supra*. See, also, *Graff v. Triple B Development Corp., supra*. Because Isham abandoned the garage, he was not entitled to recover the garage and his remaining assignments of error are moot.

## CONCLUSION

For the reasons set forth above, we affirm the district court's order denying Isham's complaint.

Affirmed.