Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/04/2024 09:08 AM CDT

DYLAN R. ISHAM, APPELLANT, v.
BILLY C. JACK, APPELLEE.
___ N.W.3d ___

Filed October 4, 2024.    No. S-22-880.

1. **Specific Performance: Equity: Appeal and Error.** An action for specific performance sounds in equity, and on appeal, an appellate court tries factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent from the conclusion reached by the trial court.
2. **Replevin: Judgments: Appeal and Error.** In a replevin action tried without a jury, the findings and disposition of the trial court have the effect of a jury verdict and will not be disturbed unless clearly wrong.
3. **Replevin: Proof.** In a replevin case, the plaintiff has the burden to prove by a preponderance of the evidence that at the time of the commencement of the action (1) the plaintiff was the owner of the property sought, (2) the plaintiff was entitled to immediate possession of the property, and (3) the defendant wrongfully detained the property.
4. **Replevin: Abandonment.** Abandonment is a complete defense to a replevin action.
5. **Abandonment: Proof: Words and Phrases.** Abandonment is the voluntary and intentional relinquishment of a right to property, and the evidence proving abandonment must be clear and convincing.
6. **Abandonment: Intent.** The primary elements of abandonment are the intention to abandon and the external act by which that intention is carried into effect.
7. ____: ____. Although an abandonment may arise from a single act or from a series of acts, the intent to abandon and the act of abandonment must conjoin and operate together, or in the very nature of things there can be no abandonment.
8. **Abandonment: Intent: Proof.** The intention to abandon is considered the first and paramount inquiry, and actual intent to abandon must be shown; it is not enough that the owner's acts give reasonable cause to others to believe that the property has been abandoned.

9. **Abandonment.** Mere relinquishment of the possession of a thing is not an abandonment in a legal sense, for such an act is not wholly inconsistent with the idea of continuing ownership; the act of abandonment must be an overt act or some failure to act which carries the implication that the owner neither claims nor retains any interest in the subject matter of the abandonment.

10. **Abandonment: Intent: Proof.** It is not necessary to prove intention to abandon by express declarations or by other direct evidence; intent to abandon property or rights in property is to be determined from all the surrounding facts and circumstances. It may be inferred from the acts and conduct of the owner and from the nature and situation of the property.

11. **Abandonment: Intent: Evidence: Proof.** Mere nonuse of property, lapse of time without claiming or using property, or the temporary absence of the owner, unaccompanied by any other evidence showing intention, generally are not enough to constitute an abandonment. However, such facts are competent evidence of an intent to abandon and, as such, are entitled to weight when considered with other circumstances.

Petition for further review from the Court of Appeals, RIEDMANN, BISHOP, and WELCH, Judges, on appeal thereto from the District Court for Butler County, CHRISTINA M. MARROQUIN, Judge. Judgment of Court of Appeals reversed and remanded with directions.

George H. Moyer, of Moyer, Moyer & Lafleur, for appellant.

No appearance by appellee.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

HEAVICAN, C.J.
## INTRODUCTION
Dylan R. Isham and Billy C. Jack entered into an agreement wherein the two would exchange a manufactured home owned by Isham for a travel trailer owned by Jack. Included in the agreement was an option for Jack to purchase a garage located on the lot with the manufactured home. A dispute arose over the garage, and Isham filed a petition to allow him to remove

the garage. That petition was denied, with the district court finding the garage had been abandoned. Isham appealed, and the Nebraska Court of Appeals affirmed. We granted Isham's petition for further review. We reverse the decision of the Court of Appeals and remand the cause to that court with directions to reverse the decision of the district court and remand the cause for further proceedings.

## FACTUAL BACKGROUND

On May 11, 2019, Isham and Jack entered into an agreement for the trade of Isham's manufactured home with Jack's travel trailer. Included in that agreement was an option for Jack to purchase a garage attached to the manufactured home:

> This trade of MFGD home and mobile home excludes the MFGD home's attached 2 car garage owned by . . . Isham located at Lot 2 Lakeside Estates. . . . Jack has the option to purchase the attached 2 car garage for the amount of $3000.00 until May 11, 2020. If the attached 2 car garage is not purchased and paid in full by May 11, 2020, . . . Isham will remove the attached 2 car garage from Lot 2 Lakeside Estates.

Jack testified and offered documentary evidence that he sent a message to Isham on June 3, 2019, to decline the offer to purchase the garage: "Hey, I'm gonna pass on the garage with the price and what it will take to fix it[.] I think it's just to much[.] I need to get it moved out soon tho so I can get other stuff done." Jack received no response, but Isham agreed that he read this message within a month of it being sent.

On February 25, 2021, Isham contacted Jack via "Facebook Messenger," noting that the option to purchase the garage had expired on May 11, 2020, and that he wanted payment for the garage or he would remove it as soon as possible. Jack and Isham then exchanged messages as follows:

> [Jack:] [I don't know] how to proceed but I messaged you in June 2019 and let you know that I wasn't interested in it and I had never heard anything back[.] I have since made repairs and put money into it.

. . . .

I'm sure we can work something out but I don't think that it will be $3k and moving the garage now isn't really an option.

. . . .

[Isham:] Honestly I'm gonna have to have a discussion with my parents before I do anything because they have it in mind to get the building to their place. Cutting the price in half is a heavy hit. I'll get back to you in a day or 2.

[Jack:] Ok . . . half of the garage is completely finished and is our living room so moving it at this point is completely out of the question. I did let you know shortly after we got it that we were not interested and I had not heard anything back so I assumed you were not interested in it any further[.] I would like to work something out with you tho.

The next day, Isham messaged Jack that the price for the garage was $3,000, with $1,500 due immediately and the rest due later. Jack responded:

I'm not gonna be able to do anything more on it[.] I have talked with a lawyer this morning about it and you were notified and I heard nothing for well more than a year.

. . . .

I'm sorry[.] I notified you on June 3rd, 2019 and you have since forfeited with no response.

Isham then messaged Jack that he would be there the next day to take measurements of the garage, and Jack responded that he would "call the sheriff if [Isham] show[ed] up."

Isham filed suit on July 8, 2021, seeking specific performance of the term in the parties' contract allowing him to remove the garage. A bench trial was held in the district court on August 16, 2022.

Isham testified at trial. He indicated that he met Jack through a mutual acquaintance who knew Isham was trying to

move out of the manufactured home and into a different home. Jack owned a small travel trailer that was located on a different lot in the same mobile home park where Isham's home was located. Isham testified that he met with Jack and that it was his understanding Jack needed more space for his family.

Isham and Jack agreed on the swap, which was negotiated mostly via Facebook Messenger but memorialized in a written agreement. Isham testified that he wanted to "help somebody out" and that his plan was to move Jack's travel trailer to land owned by his parents so he could save money to purchase a house.

Isham testified that he did not specifically recall receiving the message regarding Jack's decision not to exercise the option to purchase the garage, blaming it on working the night shift for the first time in his life; he thought he could have received the message and "cleared" it away without remembering that he had received it. Isham testified that he "would say [he read it] sometime within a month" and that

> after [Jack] being in [the manufacture home] for a while, and not having any contact, and into Covid, and all these other things, I noticed [Jack] to start working on the property. I don't remember if he resided [sic] the property, I don't remember if he started with the garage, or the house, or which way exactly it went. But from my understanding it became a part of the home, like a livable space of the home.

Isham testified that in 2020, he contacted someone about moving the garage

> probably three or four times, both in person. I think my mother might have contacted [the mover] on the phone, multiple times throughout 2020.
>
> . . . .
>
> . . . I spoke to [the mover] at the gas station, I had run into him. I had run into him at different places. And I kept asking him, can we get this moved, what would it cost? And his response was always, he couldn't find the

help. He was not available to move it because he couldn't find the labor force at that time because of Covid.

. . . .

. . . I had talked to [the mover] before I think [the option] totally expired. But I think at that point I couldn't afford it. I don't — I talked to him multiple times. But I did not — I did not look for a date of our contract to expire before I started looking into options to move it.

Isham also testified that in February 2021, he contacted Jack about moving the garage and that he had someone lined up to move the garage, though the record does not identify that person. According to Isham, it took some time to reestablish contact with Jack because Isham had switched phones and could not find Jack on Facebook. Isham acknowledged that he did not go to the manufactured home, which was still in the same location, and knock on the door or attempt to use the phone number he had for Jack.

At that point, while the conversations set forth above between Isham and Jack about moving the garage were taking place, Isham apparently began to observe Jack doing work at the property: "It was shortly after our initial . . . contact in 2021 that he started the addition." It is not clear from the record whether this is the work that Isham testified occurred "into Covid" or if it is different work.

Isham also offered photographs—which he testified that his mother took in April 2021 and in late fall of that year or in early winter 2022—of the construction work that showed an addition between the garage and the manufactured home, connecting the two. Though Isham's mother testified at trial, she did not testify that she took the photographs or when she took them.

Finally, the owner of a moving company testified. The owner stated that Isham's mother and father "approached [him] a couple different times" in May 2020 and afterward. The owner testified that at that time, he had a detached retina, and his testimony suggests that he was "laid up for about a month

laying on [his] right side." But he also testified that he did not move the garage because he "did not have a signed contract" and that he did not have staffing issues due to COVID-19. On cross-examination, he testified that if the Ishams had told him in May 2020 they wanted to go ahead with moving the garage, he "would have sent [his] crew to do it [and] would not personally have been there."

The district court found in Jack's favor, first noting that Isham sought to enforce the specific term of the parties' contract allowing Isham to remove the garage, but that this was not enforceable because the record showed a "clear abandonment" of any interest Isham had in the garage when (1) Isham failed to communicate with Jack after Jack told Isham he would not be purchasing the garage (the court found not credible Isham's testimony that he did not know how to get in contact with Jack); (2) it was Isham's mother, and not Isham, who made arrangements to move the garage from the property; and (3) Isham was solely motivated to obtain the garage for his parents' property. The court stated:

It would be inequitable for the Court to enforce a right that . . . Isham has neglected himself to timely enforce to the clear detriment of . . . Jack. The Court acknowledges that the owner of the garage is . . . Isham. While [Isham] contends that the focus is not on due diligence, the law does require that individuals act on their rights. Diligence in exercising one's rights to ownership impact the rights of others. Here, under [Isham's] theory of the case, [he] is the rightful owner of the garage, . . . Jack has never paid the $3000, therefore [Isham] could return at any future time and seek [a] writ of assistance for removal. Such an outcome is precluded by equitable theories of justice. What if [Isham's] parents had purchased their new farm in the year 2030? [Isham] cannot sit in waiting on his right and spring into action when it is most convenient; certainly not when it has prejudiced the other party.

The Court finds that for twenty months [Isham] took no action to exercise his right to remove the garage. The pictures in [the record] show the garage to be attached by a roofline and siding. Removal of the garage from the property would now require detachment from the residential property and improvement[s] have been made.

Isham appealed. The Court of Appeals affirmed, finding that the district court's reasoning that Isham had abandoned his rights to the garage and had failed to act on those rights was a finding that Isham had waived his right under the contract to remove the garage and, further, that it was not clear error for the district court to find abandonment.[1]

## ASSIGNMENTS OF ERROR

Isham assigns, renumbered, on further review that the Court of Appeals erred in (1) failing to consider Jack's failure to adduce proof of "a clear, unequivocal and decisive action" by Isham of a "knowing and intentional waiver of the clause . . . allowing [Isham] to remove his two car garage"; (2) failing to consider *Mason v. Schumacher*[2] when making its decision; (3) concluding that Isham's delay resulted in forfeiture, given Jack's delay in telling Isham that Jack considered the garage to be abandoned; (4) failing to recognize that Jack "had an equal ability and opportunity to contact Isham and assure himself that 'Isham was no longer interested in the garage' before [Jack] concluded that [he] had become the owner of the garage"; and (5) affirming the district court's judgment.

## STANDARD OF REVIEW

[1] An action for specific performance sounds in equity, and on appeal, an appellate court tries factual questions de novo on the record and, as to questions of both fact and law,

---

[1] See *Isham v. Jack*, 32 Neb. App. 647, 3 N.W.3d 656 (2024).

[2] *Mason v. Schumacher*, 231 Neb. 929, 439 N.W.2d 61 (1989).

is obligated to reach a conclusion independent from the conclusion reached by the trial court.[3]

[2] In a replevin action tried without a jury, the findings and disposition of the trial court have the effect of a jury verdict and will not be disturbed unless clearly wrong.[4]

## ANALYSIS

A threshold issue in this petition for further review is what causes of action were pled in Isham's initial complaint. We read Isham's complaint as did the Court of Appeals and find that it raises actions for both specific performance and replevin. Because we find the latter dispositive, we do not address Isham's first assignment of error relating to specific performance.

As to Isham's replevin action, the Court of Appeals noted that abandonment is a complete defense to such an action and concluded that Isham had abandoned the garage. In his petition for further review, Isham takes issue with this finding and directs us to *Mason v. Schumacher*, which holds that the lapse of time without claiming property or nonuse of property does not in itself constitute abandonment.

[3-5] In a replevin case, the plaintiff has the burden to prove by a preponderance of the evidence that at the time of the commencement of the action (1) the plaintiff was the owner of the property sought, (2) the plaintiff was entitled to immediate possession of the property, and (3) the defendant wrongfully detained the property.[5] Abandonment is a complete defense to a replevin action.[6] Abandonment is the voluntary and intentional relinquishment of a right to property, and the evidence proving abandonment must be clear and convincing.[7]

---

[3] *Walters v. Sporer*, 298 Neb. 536, 905 N.W.2d 70 (2017).

[4] *Alford v. Neal*, 229 Neb. 67, 425 N.W.2d 325 (1988).

[5] *Zelenka v. Pratte*, 300 Neb. 100, 912 N.W.2d 723 (2018).

[6] See 66 Am. Jur. 2d *Replevin* § 32 (2021). See, also, *Graff v. Triple B Development Corp.*, 622 S.W.2d 755 (Mo. App. 1981).

[7] *Mueller v. Bohannon*, 256 Neb. 286, 589 N.W.2d 852 (1999).

As Isham notes, the Court of Appeals did not extensively cite to this court's propositions regarding abandonment; in particular, it omitted those dealing with the passage of time. We restate and reiterate those propositions as follows.

[6,7] The primary elements of abandonment are the intention to abandon and the external act by which that intention is carried into effect.[8] Although an abandonment may arise from a single act or from a series of acts, the intent to abandon and the act of abandonment must conjoin and operate together, or in the very nature of things there can be no abandonment.[9]

[8,9] The intention to abandon is considered the first and paramount inquiry, and actual intent to abandon must be shown; it is not enough that the owner's acts give reasonable cause to others to believe that the property has been abandoned.[10] Mere relinquishment of the possession of a thing is not an abandonment in a legal sense, for such an act is not wholly inconsistent with the idea of continuing ownership; the act of abandonment must be an overt act or some failure to act which carries the implication that the owner neither claims nor retains any interest in the subject matter of the abandonment.[11]

[10,11] It is not necessary to prove intention to abandon by express declarations or by other direct evidence; intent to abandon property or rights in property is to be determined from all the surrounding facts and circumstances.[12] It may be inferred from the acts and conduct of the owner and from the nature and situation of the property.[13] Mere nonuse of property, lapse of time without claiming or using property, or the temporary absence of the owner, unaccompanied by any other

---

[8] *Mason v. Schumacher, supra* note 2. See, also, *Mueller v. Bohannon, supra* note 7.

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

evidence showing intention, generally are not enough to constitute an abandonment.[14] However, such facts are competent evidence of an intent to abandon and, as such, are entitled to weight when considered with other circumstances.[15]

The burden of proof as to the replevin action was on Isham; the burden as to Jack's defense of abandonment was on Jack.[16] Jack had to show that Isham had abandoned the garage. We conclude that Jack did not meet that burden, though we disagree with Isham's suggestion that the only evidence presented was that involving Isham's nonuse of the garage and the passage of time.

On June 3, 2019, less than a month after the parties completed the exchange of the travel trailer for the manufactured home, Jack messaged Isham to reject the option to purchase the garage. At that time, Jack asked Isham to remove the garage. Isham never responded to that message. Over 20 months later, Isham messaged Jack to tell him Isham was coming the next day to remove the garage.

There is evidence in the record regarding the period of time between Jack's request to remove the garage and Isham's message to Jack months later that Isham was coming to remove the garage. For example, the record shows that Isham and his family were exploring options for moving the garage, a fact which it is undisputed Jack was unaware of. And the record shows that at some point, Jack began integrating the garage into the manufactured home.

But this evidence is not relevant to Isham's intent as it was known to Jack. And other than the initial request regarding removal of the garage and the passage of time, which, as we observe above, is insufficient, Jack did not direct the district court to any evidence showing Isham had any intent to abandon.

---

[14] *Id.*

[15] *Id.*

[16] See *Nathan v. McDermott*, 306 Neb. 216, 945 N.W.2d 92 (2020).

As such, Jack did not meet his burden to show that the garage had been abandoned, and the district court was clearly wrong in concluding otherwise. We accordingly reverse the Court of Appeals' decision and remand the cause to that court with directions to reverse the decision of the district court and remand the cause for further proceedings in the district court.

Though we agree that Isham has prevailed in his replevin action, we decline to order the garage be returned to Isham, given the undisputed evidence in the record that the garage has been integrated into Jack's home. If the property subject to a replevin action is not returned, the measure of damages is the value of the property as proved, together with lawful interest thereon from the date of the unlawful taking. We therefore remand the cause to the Court of Appeals with directions to remand the cause to the district court for further proceedings.

## CONCLUSION

We reverse the decision of the Court of Appeals and remand the cause to that court with directions to reverse the decision of the district court and remand the cause for further proceedings.

REVERSED AND REMANDED WITH DIRECTIONS.